Lee Garrett **WILEY**, Jr., Appellant,

v.

**UNITED STATES** of America, Appellee.

Nos. 15925–15927.

United States Court of Appeals Eighth Circuit.

July 16, 1958.

E. C. Mogren, St. Paul, Minn. (Mogren & Kempe, St. Paul, Minn., on the brief), for appellant.

Hyam Segell, Asst. U. S. Atty., St. Paul, Minn. (George E. MacKinnon, U. S. Atty., St. Paul, Minn., was with him on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and VAN OOSTER-HOUT, Circuit Judges.

WOODROUGH, Circuit Judge.

These three appeals are taken upon a single transcript from convictions of appellant under three indictments consolidated for trial for violations of the White Slave Traffic Act, 18 U.S.C.A. § 2421 et seq. They severally charged that on January 5, 1954, appellant induced, enticed and persuaded a woman, shown to be Betty O'Neill, to go by common carrier from Minneapolis, Minnesota to Billings, Montana for the purpose of prostitution, debauchery and other immoral practices; that on January 2, 1954, he persuaded, induced and enticed her to go by common carrier from Waukesha, Wisconsin to Minneapolis, Minnesota for the same purposes; and that on February 15, 1954, he persuaded, induced and enticed her to go by common carrier from Waukesha, Wisconsin to Minneapolis, Minnesota for the same purposes.

Evidence was adduced on the trial to the effect that Betty O'Neill was 28 years old at that time and had been a prostitute for seven years; that she first met appellant on December 26, 1951, while traveling by train between Chicago and Cleveland; that she had a conversation with him at that time in which she informed him, in response to an inquiry by him, that she was a prostitute and he informed her that he was "in the business"; that upon arriving in Cleveland, Ohio, she went to appellant's apartment, had sexual relations with him and stayed overnight with him; that the next day, December 27, 1951, appellant drove her to Canton, Ohio where he arranged for her to go into a house of prostitution; that she stayed in this house a few days and then appellant picked her up, stayed with her overnight and she gave him about $100.00, her earnings from the prostitution; that she then went back to the house of prostitution and stayed about 10 days; and that she did not see appellant again until she visited him about three weeks later, in January, 1952, while he was in prison in Madison, Wisconsin; that during this visit she was instructed by appellant to "hustle" together with Diane, appellant's wife, in Chicago and to save her money until he completed serving his time; that she agreed to wait for him and save her money so that they would be "in good shape" when he got out; and that she continued to work in certain houses of prostitution in Wyoming while appellant was confined in the penitentiary. When appellant was released from the penitentiary in the latter part of December, 1953, she had a telephone conversation with him from her home in Waukesha, Wisconsin, in which he told her to come from there to Minneapolis, Minnesota, and that they "would pick up where they had left off"; that she understood what he meant because she was a prostitute and "he was a known pimp * * * and he wouldn't have me if I wasn't a prostitute"; that pursuant to this direction from him she traveled by train from Milwaukee, Wisconsin to Minneapolis, Minnesota; that appellant met her at the train; and that she lived with him and commenced prostitution activities in Minneapolis, the price going to appellant.

The charge of the second indictment was based upon the persuading, inducing and enticing of the woman by the appellant evidenced by this conversation and attendant circumstances.

The evidence then showed that shortly after her arrival in Minneapolis, Betty O'Neill had a conversation with appellant regarding her going to Billings, Montana; that appellant said he thought that if she could make more money there, that that was the place to go; that he

gave her money to go to Montana;[1] that while in Billings, Montana she sent money to appellant from her prostitution activities; that upon her return to Minneapolis there was some conversation with appellant to the effect that she did not behave herself out west and did not send the money to appellant according to their arrangement; and that she then returned to her home in Waukesha, Wisconsin.

The charge of the first indictment was based on what appellant told the woman about going to Billings, Montana, and the attendant circumstances.

As to the third indictment, Betty O'Neill testified that after she had been at her home in Waukesha, Wisconsin about two weeks, appellant called her by telephone and asked her to return to Minneapolis, Minnesota, stating that he thought she could do better in Minneapolis than working in a house; that pursuant to that request she went to Minneapolis from Waukesha; that appellant met her at the station; and that they immediately took up residence at 75 Hoag Avenue, Minneapolis, Minnesota, and began living together; and that appellant arranged dates for her for purposes of prostitution and received the proceeds therefrom.

There was substantial evidence from which it could reasonably be inferred that 75 Hoag Avenue was a house where prostitution was engaged in during the period in question. Several witnesses who had been prostitutes testified that they lived at 75 Hoag Avenue in January and February, 1954, and that appellant and Betty O'Neill were living there together at the time. It is well settled in cases under the Mann Act, that the character of the premises to which the transported woman is taken, may be shown as throwing light on the object or purpose of the transportation. United States v. Jamerson, D.C., 60 F.Supp. 281, 286; Pine v. United States, 5 Cir., 135 F.2d 353, 356.

Betty O'Neill further testified that she left appellant around the end of February, 1954, saw him once or twice after that in Chicago and on one occasion in 1955, while in Chicago, appellant asked her if she could come back to him and told her that if she did "she could be his main woman and that he would keep his living quarters in (her) apartment". She testified to conversations she had with appellant about other girls who were his prostitutes and she described in detail two beatings she had suffered at the hands of appellant during the time she was living with him because of her failure to pick up a prostitution date. She testified that during the period she was prostituting for appellant she had turned over $400 to $500 to him.

Five confessed prostitutes and a former owner of a house of prostitution corroborated many of the details of Betty O'Neill's testimony. They supplied the details of appellant's conduct and activities before, during and after the periods covered by the charges set forth in the indictments bearing on the essential element of intent to commit the offenses charged.

Appellant testified on his own behalf and admitted that he met Betty O'Neill on December 26th, 1951, while traveling by train to Cleveland, Ohio, but he stated that when they arrived in Cleveland he took her around to various night clubs and that Betty stayed at a girl's home for the night. He testified that he drove her to Canton, Ohio the next day at her own request; that he never received any money from her; that he saw her again a short time later in Canton after he had returned from Canada; and that they discussed the fact that Betty was to return to a house of prostitution. He admitted that the next time he saw her was when he was in prison in Madison, Wisconsin in January of 1952, but he denied telling her to hustle for him. He stated that while he was serving a sentence at Leavenworth he had no contact with her. He admitted that he had a telephone con-

1. However, on cross examination Betty O'Neill admitted that she called a friend in Montana and received some of the money from there.

versation with Betty about January 1, 1954, relative to her coming to Minneapolis and he testified that he told her that "if she wanted to she should come to Minneapolis". He admitted that he met her at the train depot in Minneapolis and that he arranged to have her stay at Clifford Hall's house. He recalled that the following day Betty called Billings, Montana, to get money from a friend so that she could go out there. He stated that he did not see her again until a month and a half later when he met her at Clifford Hall's house. He said she was passing through Minneapolis on her way home to Waukesha, Wisconsin and that subsequently she returned to Minneapolis with her personal belongings and moved in at 75 Hoag Avenue, where he was also living at the time. He claimed, however, that they had separate rooms.

Appellant denied ever making any arrangements for Betty O'Neill to go to a house of prostitution and he denied knowing that she was a prostitute until she testified to that fact in court. He denied ever asking her to come to Minneapolis or discussing the advisability of her going to Billings, Montana, or discussing her "hustling" for him in Minneapolis and further denied receiving any money from her as a result of her hustling in either Billings or Minneapolis. He denied arranging any dates for her in Minneapolis and denied that he had ever physically abused her, although he admitted having had an argument with her. He denied having made a telephone call to Waukesha, Wisconsin, relative to her returning to Minneapolis the second time.

The only witnesses called by appellant, his father and sister, testified merely as to calls the father received from Betty O'Neill relative to information about appellant's release date from prison. These calls were made in the summer, fall and winter of 1953.

The vital issues of the case were whether appellant did "persuade, induce and entice" the woman to make the interstate trips as alleged and if he did, whether it was with the intent alleged. Those issues were for determination by the jury. Appellant's motions for directed verdict made at the conclusion of the evidence and for mistrial were overruled and five year sentences were imposed under each indictment to run concurrently.

Appellant presents sixteen points for reversal which we consider and rule on as follows:

■ 1. Appellant contends that the court erred in not directing a verdict at the close of the government's evidence because there was no proof offered by the government that the victim traveled between any two states.

There is no merit in the contention. Betty O'Neill identified the cities of Minneapolis, Waukesha and Billings as being in Minnesota, Wisconsin and Montana respectively and she identified the common carriers by which she said she traveled from one of the cities to the other in interstate commerce.

■ 2. Appellant contends that the court erred in submitting to the jury the issue of "persuasion" under the second indictment, which involved Betty O'Neill's first trip, i. e., her trip from Waukesha, Wisconsin to Minneapolis, Minnesota. The argument is rested upon testimony given by Betty O'Neill on cross examination to the effect that she "liked" appellant and that her "sole reason" in going to Minneapolis from her home in Waukesha was to see him. The basis of the charge of persuasion in the second indictment was that appellant, in a telephone conversation during the latter part of December, 1953, told Betty O'Neill, who was then at her home in Waukesha, Wisconsin, to come to Minneapolis, where he was living, and they "would pick up where (they) had left off"; that Betty O'Neill understood that she would continue her activities as a prostitute; "I was a prostitute and he was a known pimp so there wasn't any reason—he wouldn't have me if I wasn't a prostitute"; that she "wanted to see Lee [the appellant] but also wanted—I knew I would have to hustle * * * I came to see Lee, but also to hustle"; that while in Minneapolis she lived with appellant;

that he purchased her food and drink; that he arranged prostitution dates for her; and that she turned the money from these dates over to appellant. Appellant admitted having a telephone conversation with Betty about the end of December, 1953; admitted that he met Betty O'Neill at the depot when she arrived in Minneapolis; and that he arranged for her to live at Clifford Hall's place. But he denied that he arranged prostitution dates or that she gave him money as a result of prostitution. This conflict in the testimony was for the jury and it was for the jury to say whether appellant induced or persuaded the interstate transportation for immoral purposes. Such evidence has been held sufficient to sustain a Mann Act violation. Bell v. United States, 8 Cir., 251 F.2d 490, 492; Cwach v. United States, 8 Cir., 212 F.2d 520, 527; McGuire v. United States, 8 Cir., 152 F.2d 577, 579.

■ While it is argued that Betty O'Neill's sole purpose in going to Minneapolis was to see appellant, the evidence does not indicate that this was appellant's sole purpose in having her come to Minneapolis. It is well settled that under a charge of inducing interstate transportation of a female for immoral purposes, the offense is complete when the female has been induced to and has crossed the state line pursuant to the immoral purpose or intent in the mind of the person who has persuaded her. Neff v. United States, 8 Cir., 105 F.2d 688, 691; Batsell v. United States, 8 Cir., 217 F.2d 257, 261. It affords no defense for appellant that the victim consented to the transportation. Gebardi v. United States, 287 U.S. 112, 119, 53 S.Ct. 35, 77 L.Ed. 206. The court properly submitted the issue of persuasion under this indictment to the jury.

■ 3. Appellant contends the court erred in not granting a mistrial on the ground that evidence had been introduced by the government as to appellant's reputation of being a pimp. It appears that two government witnesses, who had known appellant over a period of years

and who were admitted prostitutes, testified on November 6, 1957, that appellant was a known "pimp and panderer".

However, this evidence, together with that of Betty O'Neill to the same effect, was stricken by the court when the trial resumed on November 8, 1957, and the jury was instructed:

"* * * I should first say to you, members of the jury, that on Wednesday last we had several witnesses testify, including Betty O'Neill, the alleged victim, Sandra Miller and Shirley O'Day, who gave testimony with reference to the reputation of the defendant. They were asked questions as to whether or not they knew the reputation of this defendant and they said they did and they gave testimony with reference to that reputation. Now all of that testimony is ordered stricken from the record and the jury is instructed to disregard that testimony with reference to the defendant's reputation. Treat it as if you had never heard it and do not consider it in your deliberations."

When, at the close of all the evidence, the court instructed the jury, it gave the following instruction:

"Evidence which was introduced in this trial and was thereafter stricken by the court must be erased from your minds and must be entirely disregarded by you and must lend no inference or influence of any kind in the formation of your ultimate judgment."

■ As this Court stated in Dolan v. United States, 8 Cir., 218 F.2d 454, 460: "The general rule is that where evidence is erroneously admitted, the subsequent striking of it from the case, accompanied by a clear and positive instruction to the jury to disregard the evidence, cures the error. But if the evidence is of such an exceptionally prejudicial character that its withdrawal from the consideration of the jury cannot remove the harmful effect caused by its admission, a new trial will be granted." Cf., Davis v. United States, 8 Cir., 229 F.2d 181, 188.

We do not think the evidence complained of here was of such an exceptional character that its withdrawal from consideration by the jury did not remove the harmful effect, if any, and we have no right to assume that the jury did not follow the directions and instructions of the court. Davis v. United States, 8 Cir., supra, at page 186.

There was competent evidence in this case of appellant's pandering activities which was unassailable. He had told Betty O'Neill at their first meeting, when she informed him of her occupation as a prostitute and he put her in a house of prostitution, that he "was in the business". He admitted as a witness in his own behalf that he had plead guilty to a prior violation of the White Slave Traffic Act, for which he was sent to the penitentiary. Thus the fact that he was engaged in pandering was established and the evidence that he had that reputation among prostitutes was merely cumulative and could not have prejudiced him even if it had not been stricken. We cannot say, after considering the evidence presented, that the testimony complained of was of such an exceptionally prejudicial character that the jury was swayed or that appellant's substantial rights were affected by it. Compare Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557.

■ 4. It is next contended that the court erred in admitting evidence of appellant's first meeting with Betty O'Neill when he met her on the train in December, 1951. It is argued that this evidence is preliminary and unrelated to the charges in the indictment.

■■ The record shows that appellant met Betty O'Neill on December 26th, 1951, and he remained at liberty during a period of approximately one month following, after which time he went to Leavenworth penitentiary where he remained until a few days prior to the offenses charged in the indictments here. It is well settled that the purpose for which the interstate transportation is induced may be inferred from the conduct of the parties within a reasonable time before and after the transportation. United States v. Reginelli, 3 Cir., 133 F. 2d 595, 598. "Obviously an accused will not himself disclose his intent. Hence it is well settled that it may be discovered elsewhere, as from evidence of other similar activities of the accused * * *." United States v. Pape, 2 Cir., 144 F.2d 778, 781. "'Where the intent of the parties is a matter in issue, it has always been deemed allowable * * * to introduce evidence of other acts and doings of the party, of a kindred character, in order to illustrate or establish his intent or motive in the particular act directly in judgment.' * * * 'Relevant and competent evidence of guilt is not rendered inadmissible because it also tends to prove that the defendant committed another offense.'" Tedesco v. United States, 9 Cir., 118 F.2d 737, 740. Intent, motive or purpose necessary for the establishment of a crime may rest in inference and may be proved by circumstantial evidence. United States v. Reginelli, supra, 133 F.2d 595–598.

■ As this Court held in Neff v. United States, 8 Cir., supra, 105 F.2d 688, 691:

"The intent and disposition with which one does a particular act must be ascertained from his acts and declarations before and at the time; and when a previous act indicates an existing purpose, which from known rules of human conduct may fairly be presumed to continue and control the defendant in the doing of the act in question, it is admissible evidence * * * The practical limit to its admission is that it must be * * * sufficiently near in point of time, to afford a presumption that the element sought to be established existed at the time of the commission of the offense charged. The limit is largely in the discretion of the judge."

Cf., Hall v. United States, 9 Cir., 235 F. 2d 869, 870. Betty O'Neill was thoroughly cross examined concerning the events that transpired during the period

preceding appellant's imprisonment and appellant also told of his actions during the same period of time. Questions as to the admissibility of this class of evidence are within the sound discretion of the trial court, and the court here, in considering this evidence of prior misconduct, gave the following limiting instruction to the jury:

"Now in considering the conduct of the defendant before and after the alleged transportation you may consider the testimony of other witnesses in this case as to alleged misconduct by the defendant with such witnesses as bearing on the defendant's intent to commit the crimes here alleged. You may not conclude, however, that proof of such misconduct is proof of the crime alleged here. Such evidence with reference to other alleged misconduct principally were these prostitutes who testified. Such evidence was received and may be considered by you for the limited purpose of bearing on the question of intent of the defendant to commit the crimes charged."

We think the evidence of the relations of appellant and Betty O'Neill during the period in question was admissible. While it was preliminary in time, because of the time that elapsed while appellant was in prison (until a few days prior to the offense charged in the second indictment) it was proper to show his course of conduct and it had a direct bearing upon the purpose and intent with which the later interstate transportation was made. In view of the facts presented in the record of this case, and the clear and unambiguous instruction given by the court as to the limited purpose of this evidence and restricting its effect solely to the question of intent, there was, in our opinion, no abuse of discretion in admitting the challenged evidence.

5. It is next urged that the court erred in permitting the government too much latitude in examining one of its own witnesses, one Mattie D. Nelson, wherein government counsel asked the witness whether she had ever been in Colp, Illinois, or whether she had ever "hustled" for the appellant in 1954. Appellant argues that the testimony had no bearing on the issues of this case since there was no showing as to any happening in Colp, Illinois, or that the witness had ever "hustled" for appellant. The witness testified that she had been in Colp, Illinois, but that she had never hustled for anyone in her life. She did state that she was a prostitute and that she had known appellant all of her life and that she lived with him in Minneapolis during 1954. There was testimony that she was "hustling" for appellant in February and March of 1954, the time of the acts charged herein.

It has been held, in prosecutions charging violations of the White Slavery Act, that evidence is admissible to show other similar offenses committed by a defendant, with the same or another female. Kinser v. United States, 8 Cir., 231 F. 856, 859–860; Baish v. United States, 10 Cir., 90 F.2d 988, 990; Tedesco v. United States, 9 Cir., supra, 118 F. 2d 737, 741; Cohen v. United States, 5 Cir., 120 F.2d 139, 140; United States v. Pape, 2 Cir., supra, 144 F.2d 778, 780–781; Cf., Wigmore on Evidence, Section 357–360.

While we agree that the evidence presented here as to this witness was not directly connected to the offenses charged against this appellant, in our opinion, it goes to the vital question of the purpose and intent with which the charged interstate transportation was induced; it tends to corroborate the intent and purpose of appellant by showing his present and continuing immoral purposes as to females of this class; and it was properly the subject of direct examination. Compare Neff v. United States, supra, 105 F.2d at page 692.

Appellant complains that government counsel threatened the witness when he cautioned her "that there is a penalty for perjury. I just want you to keep that in mind in answering * * * question". Our reading of the record

in this case indicates that the admonition given here did not create a prejudice against the appellant in the minds of the jury. The matter presented here was entirely within the discretion of the trial court and no question was ever raised in that court about an abuse of discretion covering this examination. We do not find that the court abused its discretion in refusing to strike the entire testimony of this witness.

6. It is contended that the court erred in allowing the victim, Betty O'Neill, to testify as to what she understood the words used by appellant, "picking up where we left off", meant, and in allowing her to answer certain questions as to her state of mind and her purpose in making the trips involved in the indictments.

We think this contention was adequately disposed of by this Court in Batsell v. United States, 8 Cir., 217 F.2d 257, 262, where we said:

"* * * While the ordinary rule confines the testimony of a lay witness to concrete facts within his knowledge or observation, the Court may rightly exercise a certain amount of latitude in permitting a witness to state his conclusions based upon common knowledge or experience. See United States v. Trenton Potteries, 1927, 273 U.S. 392, 407, 47 S.Ct. 377, 71 L.Ed. 700; Zimberg v. United States, 1 Cir., 1944, 142 F.2d 132, 135, certiorari denied 323 U.S. 712, 65 S.Ct. 38, 89 L.Ed. 573. This, we think, was a proper place for the Court to exercise such discretion. The term 'job', as used here, had a connotation different from the ordinary usage of the term. Marcella Martin, being a close friend of Gloria Jordell and knowing of her association with the appellant, was in a position to know in what sense the term was being used and therefore was properly permitted to testify as to what she thought was meant by the term."

Cf., Shama v. United States, 8 Cir., 94 F.2d 1, 5; Parente v. United States, 9 Cir., 249 F.2d 752, 754.

The court did not abuse its discretion in allowing the testimony of Betty O'Neill as to her understanding of the meaning of the words used by appellant. Betty O'Neill had known the appellant for some period of time, she had lived with him, had sexual relations with him on numerous occasions and had engaged in prostitution for him. From her association with appellant she was in a position to know what he meant when he said they "would pick up where they had left off" and she was properly permitted to testify as to what she understood the language used meant and to testify as to her state of mind and purpose in making the trips alleged in the indictments.

7. It is urged by appellant that certain hearsay testimony was brought in during the trial, but from our review of the record presented we find that no objections to the testimony were taken on that ground during the trial and it was not presented here in such a manner as to direct our attention to the precise question urged. "It is a cardinal rule of appellate practice that, absent some compelling or persuasive reason to avoid an obvious miscarriage of justice, questions not presented to the trial court and not properly presented on appeal will not be considered." Christianson v. United States, 8 Cir., 226 F.2d 646, 654; Bell v. United States, 8 Cir., supra, 251 F.2d 490, 493.

8. Appellant contends the court erred in not striking the testimony of Sandra Miller after the best evidence rule had been violated. Sandra Miller testified on rebuttal that appellant took over her rooming house at 75 Hoag Avenue and that a written lease had been executed. The lease was not produced and appellant urges that Sandra Miller's testimony should have been ruled out on the ground that it was not the best evidence.

The record shows that the lease in question had been lost or destroyed and

could not be produced. Under such circumstances secondary evidence became admissible. Secondary evidence of a document may consist of a copy proved to be correct, or, when the absence of the primary evidence is satisfactorily accounted for, oral evidence of the contents by one who has seen it and knows its contents. Hartzell v. United States, 8 Cir., 72 F.2d 569, 578. The record here shows that Sandra Miller had testified in the government's case in chief regarding the lease without objection, and appellant himself, on direct examination by his counsel, brought out the same fact that he had taken over the lease from Sandra Miller. This evidence on rebuttal, therefore, was merely cumulative evidence of a fact which had previously been established by the testimony of two witnesses. This being so, the conclusion is warranted that appellant was not prejudiced by the admission of such testimony on rebuttal. Cf., United States v. Reed, 2 Cir., 96 F.2d 785, 786.

9. Appellant contends that the court erred in permitting Betty O'Neill to testify that it was "a principle among prostitutes not to inform the F.B.I. on their men or to get them in trouble". It is argued that this testimony was hearsay and not admissible.

This point, while it is set forth by appellant, has not been briefed or argued on this appeal and our search of the record convinces that the court did not err in allowing the victim, a prostitute for over seven years, to testify, from her personal observation and first-hand knowledge, as to this situation that existed among the prostitutes in that area at the time of the offenses alleged herein. Cf., Batsell v. United States, 8 Cir., supra, 217 F.2d 257, 262.

10 through 14. Under these points it is argued that the court erred in permitting the prosecution to cross examine appellant as to facts not brought out on direct examination; in receiving certain hearsay evidence; and in receiving immaterial evidence.

Patricia Cox testified on direct examination that she knew appellant and in the course of her testimony stated that she had taken a trip with him to Cleveland "about two months ago". Objection was made and the court ordered the testimony stricken and instructed the jury to disregard it. Recalling what we have said under part 3 herein, we are unable to say this evidence resulted in prejudice to appellant.

The government had been compelled to claim surprise in interrogating two of its witnesses because of their obvious reluctance to testify and one of the reluctant witnesses testified that she had been in the company of the appellant at the Golden West Hotel on at least two occasions during the course of the trial and that the other reluctant witness was also present.

The alleged immaterial and hearsay evidence complained of here did not directly bear upon any decisive issue in the case and we are not convinced that it was prejudicial.

The prosecutor examined appellant on cross examination about certain automobiles that he owned over a period of years (1954 through 1957). The prosecutor's theory as to this line of questioning was that appellant received large earnings from the numerous prostitutes that he controlled and that this brought about an affluence which was not warranted by his legitimate occupations.

The most that can be said in appellant's behalf on this point is that some of this evidence was not material to the case against him. However, this evidence did not bear directly upon the real issue of persuasion and the latitude to be allowed on cross examination of an accused, when he voluntarily takes the stand on his own behalf, must be left largely within the discretion of the trial court. Davis v. United States, 8 Cir., supra, 229 F.2d 185–186–187; Howard v. Territory of Oklahoma, 8 Cir., 169 F. 47, 51, 52–53.

The very nature and background of these cases, as shown by the record, together with the unsavory testimony of

all the witnesses, coupled with the evasive testimony of appellant on direct examination, laid him open, in all fairness, to vigorous and detailed cross examination. Indeed, "the office of cross-examination is to test the truth of the statements of the witness made on direct; and to this end it may be exerted directly to break down the testimony in chief, to affect the credibility of the witness, or to show intent. The extent to which cross-examination upon collateral matters shall go is a matter of discretion of the trial judge and his action will not be interfered with unless there has been upon his part a plain abuse of discretion". United States v. Manton, 2 Cir., 107 F.2d 834, at page 845. Lovely v. United States, 4 Cir., 175 F.2d 312, 314.

We think that while the cross examination of appellant in certain instances may have been extended to the border line, it did not amount to a denial of any substantive right of the appellant and could by no means justify a reversal of his conviction.

■ 15. Appellant contends the court erred in allowing the government to elicit hearsay testimony from the witness Harriet I. Lewis. The testimony here complained of was given during the government's examination of the witness and related to whether she had ever observed "any physical harm on any girl that was associated with Lee Wiley". The witness answered "Yes" and that the girl's name was "Diane". We do not find any error in this testimony and in line with what has been said herein, the testimony was pertinent in establishing the intent of the appellant and in showing the type of influence and control he exerted over the girls who appear in this continuous story of his activities. It fell within the "well-established doctrine that other instances of similar conduct are competent to prove intent (or purpose) upon the occasion for which the accused is on trial". United States v. Krulewitch, 2 Cir., 145 F.2d 76, 80; Neff v. United States, 8 Cir., supra, 105 F.2d 688, 691.

16. Appellant finally contends that government counsel was guilty of making improper statements and arguments to the jury. We think the remarks complained of were not sufficiently important to merit repetition here. For the most part they consisted of comments upon and inferences drawn from the subject matter of the evidence and the circumstances of this case and we do not think these remarks were prejudicial or fatal to the appellant. The prosecutor's characterization of a portion of the evidence and his expressions of opinion were not so extreme as to draw any objection from vigilant counsel or from the court at the time. They afford no ground for reversal.

Although some further points have been argued and have been fully considered, they lack merit and have not required discussion.

We conclude that the trial was without error and was fair and impartial. The judgment is supported by substantial evidence and is affirmed.

Affirmed.