UNITED STATES of America,
Appellee,

v.

Salvatore CIOFFI, Appellant.

No. 696, Docket 73–2612.

United States Court of Appeals,
Second Circuit.

Argued Jan. 25, 1974.

Decided March 14, 1974.

* Rule 18, 5 Cir., *see* Isbell Enterprises Inc. v. Citizens Casualty Company of New York et al., 5 Cir., 1970, 431 F.2d 409, Part I.

John Timbers, Asst. U. S. Atty., New York City (Paul J. Curran, U. S. Atty. S. D. N. Y., Elliot G. Sagor and S. Andrew Schaffer, Asst. U. S. Attys., New York City, on the brief), for appellee.

Irving Anolik, New York City, for appellant.

Before MEDINA, MOORE and OAKES, Circuit Judges.

MEDINA, Circuit Judge:

The jury, after a trial presided over by Judge Motley, found Salvatore Cioffi guilty on both counts of an indictment charging him with conspiracy to obstruct justice and with the obstruction of justice by endeavoring to influence Perry Scheer, described as "a witness in the United States District Court for the Southern District of New York, having been duly subpoenaed to appear before a Grand Jury duly empaneled and sworn in that Court," and he appeals from the judgment of conviction. He was sentenced to concurrent terms of eighteen months imprisonment on each count and is enlarged on bail pending the determination of this appeal.

A thorough examination of the entire transcript, the exhibits and the sealed envelopes containing a quantity of alleged 3500 material that was withheld from counsel for Cioffi has convinced us that there is no merit in any of the claims of error, and that there was ample proof sufficient to sustain the verdict. We affirm the judgment appealed from.

The simplicity of the basic issue will, we think, be brought into focus if we first describe the background leading to the alleged conspiracy and then follow chronologically the acts and conversations of Cioffi that were found by the jury to have constituted the commission of the substantive crime of violating the Obstruction of Justice Act, 18 U.S.C., Section 1503.[1]

*I*

*Background*

As so often in the past we are again in this case dealing with a so-called brokerage house operating on the New York Over-the-Counter Exchange. This firm of Kelly, Andrews & Bradley when the market was "hot" made a specialty of floating numerous underwritings of new issues of stocks of little or no value and by various deceptive and illegal practices mulcting investors. There is testimony that there was no Kelly, no Andrews and no Bradley. In any event the three persons in charge of operations at first were Stuart Schiffman, known as Stuie, Fred Miller and Perry Scheer, who turned out to be the principal witness against Cioffi. These three were all "registered representatives," which

---

1. 18 U.S.C., Section 1503. Influencing or injuring officer, juror or witness generally

Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any party or witness in his person or property on account of his attending or having attended such court or examination before such officer, commissioner, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

meant that they were licensed to buy and sell securities.

The activities of the firm evidently attracted the attention of Joseph Marando who decided to muscle in and who knew just how to do this. So, in October 1970 we find Marando making a loan of $25,000 to Schiffman, Miller and Scheer. This, however, was no ordinary loan but was a clear violation of the New York Criminal Law, New York General Obligations Law, Section 5-501, because it was agreed that interest at the rate of 104% per annum should be paid in weekly amounts of $500 or 2% each, in cash. The language of the professional criminal element in New York City was well known to all these people and cash was called "green" and the extortionate interest was called vigorish or "vig." This is reminiscent of what we read in the testimony in United States v. Corallo, 413 F.2d 1306 (2d Cir.), cert. denied, 396 U.S. 958, 90 S.Ct. 431, 24 L. Ed.2d 422 (1969) and United States v. Callahan, 439 F.2d 852 (2d Cir. 1971). In his testimony Scheer, in his colorful way, always referred to this as a "shylock" loan. In any event, it is right in the center of the case against Cioffi. From the cases we have had before us in the past we think it is pretty clear that such extortionate loans are often made to those making quick profits from criminal enterprises of one kind or another, and, when the "vig" is not promptly paid something is apt to happen.

The following is Scheer's description of what happened when the "vig" on this $25,000 loan was not forthcoming:

Q What happened after October 1970 with respect to payments on that loan?

A The firm paid the weekly interest rate and when the first (sic) had difficulties, as many brokerage firms did, Mr. Marando became very violent and very upset that the interest always had to be met no matter what happened and he voiced threats of physical harm and violence and he always sat in Mr. Schiffman's seat and he threw everything off the desk, the blotters, the notes, the telephone, the telephone book, the coffee, whatever was there violently, saying that if we were ever late, which we were from time to time, he would send collectors to our home to take our wives or our furniture, whatever he could get. The money had to be paid on time.

Q By the way, had you discussed your wife's medical condition with Marando?

A Yes, he was very aware of it. We shall hear further references to the health of Scheer's wife, who had cancer and was "totally disabled."

In August or September of 1971 Marando took over the day to day operations of Kelly, Andrews & Bradley and he had to find buyers for the stocks. One of these was a Mr. Simon who did not pay for the stock he bought. Scheer testified to a telephone conversation he heard in the office when Marando asked for the money that was due. Marando asked Simon on what floor he was located. When told it was the 27th or 30th floor Marando said that is how far you will bounce unless you come over immediately and pay for the stock you bought. Scheer says then Simon came over as requested. Judge Motley permitted the testimony as to these events, which preceded the first overt act of March 30, 1972 as alleged in the conspiracy count of the indictment. Judge Motley ruled that such testimony was allowed as background information so that the jury could understand the charges against the defendant.

As things went from bad to worse and it was necessary to give some support to the capital structure of the firm, Marando sent over 90,000 shares of Brooklyn Poly Industries stock to be subordinated and kept intact for the protection of the firm's creditors. These shares were in street names so Schiffman promptly siphoned off part of the value by using the stock as collateral for a loan from a Boston bank to satisfy a

personal debt and Scheer made off with about $25,000 more by representing to the Bank of North America that the stock belonged to him and pledging it with the bank for a loan in this amount which Scheer put in his pocket. This was plain, ordinary stealing.

It should come as no surprise that the brokerage firm became bankrupt and it ceased doing business in October 1971. It had probably been insolvent as early as the time of the $25,000 Marando "shylock" loan in October 1970. The collapse of Kelly, Andrews & Bradley was immediately followed by investigations by the SEC and by the United States Attorney in the Southern District of New York.

In early November 1971 the SEC got in touch with Scheer and so did a representative of the prosecutor's office in the Southern District of New York. At about this time Marando visited the brokerage firm's mid-town office at 747 Third Avenue and told Scheer, in the presence of Miller, that an investigation was under way. He asked Scheer if he had been subpoenaed, and when he said "no," Marando told him "please don't hurt me, I am sick, please don't hurt me." This was the beginning of the conspiracy. As we shall see, Cioffi joined the conspiracy in March, 1972. There was another conversation at the office in early January 1972, at which Marando in the presence of Miller said to Scheer, that he had been subpoenaed and had already appeared in the federal courthouse. On this occasion he again said to Scheer "Please don't hurt me, I am sick." Scheer testified before the Grand Jury on January 25, 1972.

█ Judge Motley permitted Scheer to testify to these conversations with Marando even though they occurred before the date of the conspiracy alleged in the indictment. Since Marando was named in the bill of particulars as a co-conspirator, evidence of these events preceding the conspiracy was admissible to prove the intent, purpose and aim of the parties to the conspiracy. United

States v. Cohen, 489 F.2d 945 (2d Cir., 1973).

Judge Motley instructed the jury:

While you have heard testimony about conversations between Marando and Scheer * * * that testimony is not proof that Defendant Cioffi committed the crimes that are charged in this indictment. We are here concerned only with a charge, as I have said, that Cioffi conspired to violate the obstruction of justice statute and the charge that Cioffi violated the obstruction of justice statute.

The testimony about the conversations between Marando and Scheer was offered for the limited purpose of showing the motive and intent of Marando during the course of the conspiracy, if you find there was a conspiracy.

The triple-headed investigation, by the SEC, the federal prosecutor and the FBI, at first related generally to the affairs of the brokerage firm and particularly to the manipulation of an issue of stock of All-State Metal Stamping Co., but it soon proliferated. Information about the $25,000 "shylock" loan by Marando must have trickled in slowly. But Marando had been alerted to the danger. This brings us to the activities of Cioffi and his involvement in the conspiracy to tamper with Perry Scheer, who Marando expected would be called to testify before the Grand Jury as a witness. Marando, of course, knew that Scheer would be a key witness as the loan was made to him and his two associates Schiffman and Miller, he had signed the demand note and he had repeatedly seen the "vig" paid in "green" to Marando. Scheer had personal knowledge of just about everything there was to know about the $25,000 loan.

*II*

*What Cioffi Said and Did*

Perry Scheer had an uncle named Alex Goldstein who had for many years been an officer of one of the Locals of

the Teamsters Union. Goldstein got a phone call from another member of the union named Pinter who wanted to see him. At the appointed hour, outside the Coliseum where Goldstein worked, there turned up not Pinter but two men whom Goldstein had never seen before, one of whom turned out to be Cioffi, a total stranger. While the other unidentified man stood nearby, Cioffi asked Goldstein if he could talk to him about his nephew Perry Scheer who "had a problem." They went to a restaurant across the street for coffee. Cioffi opened up an attache case and started taking out a lot of papers but Goldstein said he wasn't interested in any papers. The upshot was that Goldstein, who promptly started to call Cioffi by his first name, "Sal," arranged over the phone for a meeting at the Coliseum at 5:30 P.M. on March 30, 1972 to be attended by Sal and Perry. This was confirmed by Goldstein's diary, which was received in evidence. The meeting took place as scheduled, and the unidentified man came, too. At Cioffi's request another meeting was set up and it took place a week later.

It would be tedious to describe the details of what Cioffi said at these meetings, as a number of subsequent conversations in person and over the telephone were recorded and played for the jurors. It is sufficient to say that there were repeated references to Scheer's wife and assurances that he would not be held responsible for the repayment of the $25,000 loan or the "vig." Cioffi tried to get Scheer to read what purported to be notes of what had occurred before the Grand Jury but Scheer held off. The main thrust was to get Scheer to go to Brooklyn to see Marando and be "fortified." There was also the suggestion that Scheer should testify that Bassani had made the loan. But Scheer was "scared" and he decided the last place in the world he wanted to go was to Brooklyn to confer with Marando. Bassani was another one of the registered representatives in the office of Kelly, Andrews & Bradley.

At this point Scheer was cooperating with the FBI and, in anticipation of another meeting with Cioffi on May 18, 1972, Scheer was equipped with recording equipment. By this time Marando and his supporters had become suspicious of Scheer. When he met with Cioffi on May 18 he was patted down but not in the place where the recorder was attached to Scheer's person. A certain amount of putting his hand in front of his mouth also was of little avail to Cioffi as most of the recording was clear enough to be understood by the jurors.

██ At the trial the tapes were played again and again, when they were received in evidence, during the prosecutor's summation and, at the request of the jurors, during their deliberations. The jurors were furnished with transcripts for their convenience. While the words and phrases used by Cioffi were not in Aesopian language, they were probably used at least partially to conceal the real purport of the messages conveyed by Cioffi from Marando to Scheer, in case anyone else heard the conversations, and Scheer was permitted to state what these words and phrases used by Cioffi meant to him. While defense counsel objected to this in the most emphatic manner, we think the authorities support Judge Motley's ruling on the point. Wiley v. United States, 257 F.2d 900 (8th Cir. 1958); Parente v. United States, 249 F.2d 752 (9th Cir. 1957); and Batsell v. United States, 217 F.2d 257 (8th Cir. 1954). Moreover, we rather suspect that the jurors knew what these words and phrases were understood by Scheer to mean, anyway. At least we understand them without difficulty. The sum and substance of the May 18, 1972 recording, which destroyed every vestige of Cioffi's defense, was that Scheer should agree with all the others to "take the Fifth" and say nothing or that he should come to Brooklyn to see Marando, let Marando get a lawyer for him, and then tell the lawyer what Marando told him to say. Marando was represented as "on top of" the

whole affair. It is not surprising that Scheer was "scared" and was afraid to go to Brooklyn to see Marando.

Other conversations were also recorded but they do little more than repeat in one form or another what had been said before by Cioffi.

On May 18, 1972 the Grand Jury in the Southern District of New York handed down an indictment charging Marando with making a $25,000 extortionate loan to Schiffman, Scheer and Miller and specifying the following dates on which "express and implicit threats of violence" were alleged to have been made in connection with the collection of the loan: February 10, 1971; February 17, 1971; February 23, 1971; March 9, 1971; March 23, 1971 and September 28, 1971. This indictment was sealed and it was ordered unsealed on June 21, 1972. On July 3, 1972 a lawyer representing Marando appeared and entered a plea of not guilty. Marando was not in court at the time.

█ Goldstein testified that on July 7, 1972 he received a message from Cioffi and set up a meeting with Cioffi for July 10. This meeting led to a further meeting with Cioffi late in July or early August. At this meeting Cioffi produced two long sheets attached to each other. Cioffi wanted Goldstein to read this document and get Scheer to write out a statement "that he was never threatened or intimidated in any way." Thinking the best way to get the dates was to cut off the bottom part of the second sheet containing the dates, and the words "(Title 18, United States Code, Sections 891, 894 and 2)," followed by the signatures of the foreman of the Grand Jury and Whitney North Seymour, Jr., the United States Attorney, and a seal. It is clear to us that what Cioffi brought with him and handed to Goldstein was a copy of the two-page indictment against Marando, handed down on May 18. The upshot was that Goldstein tore off the bottom part of page 2 with the dates, the notation,

the signatures and the seal and he gave the balance of the document back to Cioffi after having photostated the part he had torn off. Indeed, Goldstein recognized the document as having been the same as the one handed to him by Cioffi, and the piece that had been photostated fitted the rest of the page perfectly. We do not think it was error to receive this document in evidence. It was not offered to prove the truth of the contents but rather to clarify the meaning of the conversation between Goldstein and Cioffi, for its bearing on the purpose and intent of Cioffi.

### III

#### The "Defense"

As Cioffi did not testify and no witnesses were called on his behalf it seems anomalous to refer to his "defense." But his counsel was resourceful and there were two lines of so-called "defense."

█ The tapes showed that a considerable part of the conversations between Cioffi and Scheer had to do with the endeavor by Marando to get Scheer to permit him to pay off the balance due on Scheer's loan from the Bank of North America secured by the Brooklyn Poly Industries stock and get this stock back to Marando, the true owner. There was nothing illegal or conspiratorial about Marando's efforts to get this stock back. The picture of Marando sending an emissary to induce Scheer to cooperate in restoring to Marando the stock Scheer had stolen from him may seem incongruous, but such is life. The claim of defense counsel was that the conversations between Cioffi and Scheer, including those recorded on the tapes, related exclusively to the Brooklyn Poly Industries stock and had nothing to do with any prospective testimony by Scheer concerning the $25,000 "shylock" loan and the "vig." This "defense" blew up by itself as the record, including the tapes, make it perfectly clear that a good part of what was said by Cioffi

was designed to induce Scheer either to "take the Fifth" and help get the other participants in the transaction to do the same or to go to Brooklyn and let Marando explain what his story was to be and get a lawyer for him. The second part of the defense strategy was to enter upon such a prolonged cross-examination of Scheer with respect to his many criminal acts as to turn the case into a trial of Scheer for his wrongdoings instead of a trial of the issues relating to Cioffi's attempt to obstruct justice by inducing Scheer to remain silent or to deny that Marando made the extortionate loan and collected the $500 a week in "green." One of Cioffi's principal claims of error is that Judge Motley refused to permit counsel to do this. The record is replete with evidence of the commission of criminal acts by Scheer, although it seems that he had never been convicted. We have already referred to some of the more serious of these criminal acts. By his own admission on the witness stand he was guilty of criminal violations of the securities laws in connection with underwritings and sales of the stock of Lady Goldie Bracelets, N.A.P. Industries, Cadgie Taylor, All-State Metal Stamping Co., Bel-Aire Financial and Fashion Week. Scheer admitted those acts of serious misconduct, the prosecution stipulated on the subject and it was also stipulated that in the Spring of 1973 he was told that he would not be prosecuted and was given immunity. All this material affecting Scheer's credibility was referred to again and again in defense counsel's summation. We hold that there was no abuse of discretion in limiting the cross-examination of Scheer under the circumstances of this case and we shall make no further reference to the subject in this opinion.

## IV

*The Obstruction of Justice Act, 18 U.S. C., Section 1503 was Properly Interpreted and Applied by Judge Motley*

■ In Cioffi's brief we are told again and again that there was no proof of threats or intimidation by him and that no conviction for violation of that statute can be sustained unless the jury was instructed to acquit Cioffi in the absence of proof of such threats or intimidation. We hold that there was proof of threats or intimidation and we also hold that Judge Motley properly instructed the jury that a verdict of guilty might be based on intimidation by threats or by corruptly endeavoring to influence the witness Scheer to give false testimony or by corruptly influencing him to invoke the Fifth Amendment.[2]

■ The statute is plainly in the disjunctive, "or." Moreover, there is no requirement that there be proof of direct threats or the actual use of force. The continual references to Scheer's wife, against the background of Marando's earlier statement of what he would do if the "vig" was not paid, were enough. She was Scheer's Achilles' heel. It is not surprising that he was "scared" and winced at every mention of her in his conversations with Cioffi. The whole tenor of the various phases of the messages from Marando, as delivered by Cioffi, was that he had better do what he was told, or else. And so the jury would have been justified in believing Scheer's testimony that he was physically afraid to go to Brooklyn to be "fortified."

■ As Judge Motley so aptly said, the key words in the statute are "cor-

2. "The obstruction of justice statute may be violated in various ways. First, the statute may be violated if the witness is intimidated by a threatening communication. As you know, intimidation includes frightening a person, inspiring or affecting him by fear or deterring him as by threats.

Second, the statute may also be violated if a witness is corruptly influenced to give false testimony before a grand jury, and third, the statute may also be violated if a defendant endeavors to corruptly influence a witness to invoke the Fifth Amendment privilege to remain silent before a grand jury."

ruptly" and "endeavors." The endeavor, whether successful or not, is the gist of the offense. United States v. Russell, 255 U.S. 138, 41 S.Ct. 260, 65 L.Ed. 553 (1921). Knowing that the loan had in fact been made and the extortionate interest paid, all to the personal knowledge of Scheer, an endeavor to induce Scheer to deny the making of the loan, or to pass it off on Bassani, or to plead the Fifth Amendment for the purpose of protecting Marando, was obviously corrupt. Judge Motley defined endeavor as "any effort or any act, however contrived, to obstruct, impede or interfere with a witness," and she told the jurors that any such endeavor is corrupt. There is no requirement that any sort of money or other consideration be received before the endeavor can be considered corrupt. United States v. Polakoff, 121 F.2d 333 (2d Cir.), cert. denied, 314 U.S. 626, 62 S.Ct. 107, 86 L.Ed. 503 (1941); Bosselman v. United States, 239 F. 82 (2d Cir. 1917); Broadbent v. United States, 149 F.2d 580 (10th Cir. 1945).

■ Cioffi insists that the mere giving of advice to a witness to plead his constitutional privilege against self-incrimination cannot be made a crime. But here we have something more than "mere" advice. The correct view as charged by Judge Motley, and as held by the Ninth Circuit in Cole v. United States, 329 F.2d 437 (9th Cir.), cert. denied, 377 U.S. 954, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964), is:

> I charge you that while a witness violates no law by claiming the Fifth Amendment privilege against self-incrimination in a grand jury, one who bribes, threatens, coerces a witness to claim it or advises with corrupt motive a witness to take it, can and does obstruct or influence the administration of justice.

The focus is on the intent or motive of the party charged as an inducer. The lawful behavior of the person invoking the Amendment cannot be used to protect the criminal behavior of the inducer. There is ample evidence that the inducer Cioffi endeavored to influence the witness Scheer.

■ An essential ingredient of the statute is that there must be a "witness" subject to being influenced. We hold that Scheer was such a witness.

## V

### Miscellanea

■ There are many other claims of error. We have given careful consideration to each of these and we find no merit in any of them. There is no evidence that the photographs of Marando were mug shots. And, even if that were so, it would be difficult to find any prejudice to Cioffi in view of what this record reveals of Marando's conduct. To describe Special Agent Parks' brief description of an extortionate loan as a lecture on the law and a usurpation of the judicial function of the trial judge is hardly worthy of comment. When Parks said in response to a question that he was attached to the Organized Crime Division of the FBI, no objection was made nor any request for an instruction to the jury that this was not evidence against Cioffi. Had such a request been made we have no doubt the statement would have been stricken and the jury would have been told to disregard it. The failure on the part of Judge Motley to give such an instruction was clearly not "plain error." Nor was it error to admit Scheer's testimony of some conversations with Goldstein that had not been covered in the prosecution's direct examination of Goldstein. When Goldstein reported to Scheer what Cioffi had told him to tell Scheer, these conversations were all in furtherance of the conspiracy and hence admissible. United States v. Montgomery, 440 F.2d 694 (9th Cir.), cert. denied, 404 U.S. 884, 92 S.Ct. 221, 30 L.Ed.2d 166 (1971). The objection that Marando was not named in the indictment as a co-conspirator but was named as such only in the bill of particulars is frivolous.

Affirmed.