UNITED STATES of America, Appellee,

v.

Rudolph BAKER, Appellant.

No. 79–5004.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 12, 1979.

Decided Dec. 11, 1979.

---

Irvin B. Tucker, Jr., Raleigh, N.C., for appellant.

Jack B. Crawley, Jr., Asst. U. S. Atty., Raleigh, N.C. (George M. Anderson, U.S. Atty., Raleigh, N.C., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and WINTER and MURNAGHAN, Circuit Judges.

WINTER, Circuit Judge:

Rudolph Baker appeals from convictions on two counts of obstruction of justice under 18 U.S.C. § 1503. The prosecution arose out of subsequent grand jury proceedings following the discovery by law enforcement officers that Baker owned and operated a house of prostitution known as the Bel Air Truck Stop at Wilson, North Carolina.[1] Specifically, Baker was charged in two counts with corruptly endeavoring to influence, obstruct and impede the due administration of justice by urging and advising each of two prostitutes employed at Bel Air—Evelyn M. Watson and Verna James

---

1. Baker and one of his managers, Roger Pennell, were convicted of violations of the Travel Act, 18 U.S.C. § 1952, for causing prostitutes to travel in interstate commerce to staff the operation, and we affirmed, *United States v. Baker,* 611 F.2d 961 (4 Cir. 1979), decided contemporaneously herewith. Reference is made to that opinion for some of the background from which this case arises.

Haymore—to testify falsely and to withhold and refuse to furnish information before a grand jury which had subpoenaed them to testify in an investigation of the prostitution operation.

The grounds of Baker's appeal are that legally there was insufficient evidence to convict him of either charge and that the district court committed reversible error in admitting testimony of an F.B.I. agent that when he interviewed Evelyn M. Watson he found her to be a truthful witness. We think the evidence legally sufficient to support the conviction on each count and the challenged evidence clearly admissible for the purpose for which it was offered. We affirm.

### I.

To the extent pertinent, the statute under which Baker was indicted provides:

Whoever corruptly . . . endeavors to influence, intimidate, or impede any witness, in any court of the United States . . . shall be fined not more than $5,000 or imprisoned not more than five years, or both.

The evidence, viewed in the light most favorable to the government,[2] showed that the true nature of the business enterprise known as the Bel Air Truck Stop was discovered by F.B.I. Agent Schweickert on February 15, 1978, when, posing as a truck driver, he was given entry into a back room. There he encountered Ms. Haymore and Ms. Watson. Watson solicited him for a sexual service, and when he purportedly agreed, she took him to a bedroom and made preparations to render the service. At that point, he revealed his identity and announced his intention to interview all present without effecting any arrests. While Schweickert was conducting interviews, Baker telephoned and talked to Watson. He advised her not to tell the F.B.I. anything. Notwithstanding this advice, Watson talked to Schweickert, and then both she and Haymore left the Bel Air Truck Stop, having made arrangements to meet Schweickert the following day.

Schweickert, Watson and Haymore met the following day at a motel in Rocky Mount, North Carolina. Both women talked to Schweickert and he assured them that they would not be charged with any criminal offenses arising out of their prostitution if they cooperated with the agents. At Schweickert's request, Watson telephoned Baker and Roger Pennell, Baker's assistant manager, and with her consent these telephone conversations were recorded. As a result of the calls, Baker and Pennell came to the motel and talked with Haymore and Watson. Baker asked whether they had seen the F.B.I. again and what they had told the F.B.I. Baker then told them not to talk to the F.B.I. and said he had a lawyer whom he would pay. He instructed Haymore and Watson to call the lawyer if the F.B.I. got in touch with them, and he gave them a paper with the lawyer's name and telephone number.

A grand jury subpoena was served on Watson on March 14, 1978. On the night before her scheduled appearance, she telephoned Schweickert and said that she was en route to Raleigh where the grand jury was meeting and that she would testify. She also said that she had some other information to give him when she saw him.

When she arrived at the Federal Building for her grand jury appearance, she saw Baker and talked to him. She was told by Baker and his lawyer not to say anything, and she was given a card setting forth a statement of her fifth amendment constitutional privilege against self-incrimination. Baker also gave her a substantial dose of valium. This medication made her unsteady on her feet, sleepy, and affected her ability to control herself.

In her grand jury appearance, she invoked her fifth amendment constitutional privilege against self-incrimination with respect to numerous questions, and she did

---

2. *United States v. Sherman,* 421 F.2d 198, 199 (4 Cir.), *cert. denied,* 398 U.S. 914, 90 S.Ct. 1717, 26 L.Ed.2d 78 (1970).

not answer the other questions propounded to her truthfully. After her grand jury appearance, Baker interrogated her about what she had said. She also talked to Schweickert and told him that upon her arrival at the courthouse she had been confronted by Baker, that she was afraid of Baker, and that she would return the next day for a further grand jury appearance. She was not invited to return, however, until a much later date.

Haymore was served with her grand jury subpoena on March 19, and she went to the place that the grand jury was meeting on March 21. The first persons she saw were Baker, his attorney, and Watson. Baker handed Haymore a card containing a statement invoking her fifth amendment constitutional privilege against self-incrimination. At trial, she testified: "he told me not to say nothing. I didn't have to say nothing." Haymore told Baker she did not need a lawyer to represent her before the grand jury and she answered the questions propounded to her.

## II.

■ The starting point for a determination of the legal sufficiency of the evidence to support the convictions is consideration of the statute and the elements constituting the offense. In this case, Baker does not contend that he did not endeavor to influence Ms. Watson and Ms. Haymore or that they were not witnesses in a court of the United States. Both were subpoenaed as witnesses in a federal grand jury investigation and both testified before a federal grand jury. Baker unquestionably sought to influence both to remain silent—with partial success as to Watson and no success as to Haymore. But the success or lack of success in endeavoring to influence such a witness is not in itself the determining factor in deciding whether the statute has been violated. The statute requires only proof of an endeavor, irrespective of its success, and makes that act a crime if the endeavor is a corrupt one. The real question here is whether the endeavor could be found to be a corrupt one when the advice

given was that the witness had a constitutional right to remain silent and should exercise that right, and when, with respect to Watson, the witness was also supplied with a drug which adversely affected her ability to testify.

The leading authority supporting an affirmative answer to the question here is *Cole v. United States*, 329 F.2d 437 (9 Cir.), *cert. denied*, 377 U.S. 954, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964). In that case, Cole was a friend and former employer of one Joel R. Benton who had been requested to appear before a federal grand jury. Benton was fearful of appearing because he had executed and filed a false affidavit with a Senate committee, and he thought that he might be interrogated about the affidavit or its subject matter. Cole advised Benton to plead the fifth amendment and pressed this advice on numerous occasions. Benton appeared and declined to answer questions on the ground that the answers would incriminate him. At one point after Benton appeared, Cole advised him to leave town. When Benton was subpoenaed for a second grand jury appearance, Cole again urged him to plead the fifth amendment, and when Benton indicated reluctance to do so, Cole threatened him with the loss of his employment if he did not. The evidence showed that Cole had made statements to government agents and had testified before the grand jury in contradiction of statements that he had made to Benton, so that it could be inferred that he wished to avoid a grand jury's being aware of the inconsistencies.

When convicted of a violation of § 1503, Cole's principal argument on appeal was that he could not have impeded Benton in giving testimony because Benton had a fifth amendment right not to incriminate himself. Therefore, so the argument ran, when Benton claimed the right, he did not obstruct justice or do anything contrary to his duties as a witness, and it cannot be a crime for one person to advise or persuade another to do that which is lawful.

Benton's contention was emphatically rejected and his conviction upheld. The court held that the lawfulness of a witness' right

not to incriminate himself is a personal privilege of the witness, but this lawfulness does not wipe out the criminality of one who acts with corrupt motive to induce a witness to exercise that privilege. Under § 1503, the intent or motive of the person charged as an inducer is of paramount importance. Thus the court was led to conclude that

> the constitutional privilege against self-incrimination is an integral part of the due administration of justice, designed to do and further justice, and to the exercise of which there is an absolute right in every witness. A witness violates no duty to claim it, but one who bribes, coerces, forces or threatens a witness to claim it, or advises with corrupt motive the witness to take it, can and does himself obstruct or influence the due administration of justice.

329 F.2d at 443.

The holding in *Cole* was adopted and followed in *United States v. Cioffi,* 493 F.2d 1111 (2 Cir. 1974). There, the evidence showed that Cioffi was a member of a conspiracy that had endeavored to influence a certain Perry Scheer by threats not to testify before a grand jury concerning the fraudulent collapse of a brokerage firm to which another member of the conspiracy had made a usurious loan. Again, the contention was advanced that Cioffi had simply persuaded Scheer to invoke the fifth amendment and such action cannot be made a crime. Of course, in *Cioffi* there was proof of threats of physical violence, but nevertheless the court ruled broadly. It stated, *inter alia,* that "[t]he endeavor, whether successful or not, is the gist of the offense" and that under the statute "the

focus is on the intent or motive of the party charged as an inducer," and approved an instruction to the jury that "one who bribes, threatens, [or] coerces a witness to claim [the privilege against self-incrimination] or advises with corrupt motive a witness to take it" is guilty under the statute.[3] *Id.* at 1119.

■ *Cole* and *Cioffi* were both decided on facts arguably more aggravated than those in the instant case. Nevertheless, we think that they correctly state the law to be applied here. Relying upon them, we readily conclude that the evidence was legally sufficient to support Baker's conviction on each count. The record established that Baker was the owner and operator of an illegal house of prostitution. Even before subpoenas were served upon the two witnesses, he had repeatedly evidenced a desire that the witnesses not cooperate with law enforcement officials—for obvious reasons. The jury could readily infer that, when Watson and Haymore were subpoenaed to appear before the grand jury, it was in his interest that they not testify, because if they testified truthfully they were bound to incriminate him. Thus, the jury could find beyond a reasonable doubt that Baker's motive and intent in advising them to interpose their right not to incriminate themselves, and in supplying Watson with a powerful sedative which adversely affected her ability to testify, was to further his interest and conceal his crime and not to protect them against self-incrimination; hence, his endeavor to impede was corrupt and one proscribed by the statute.[4] His argument before us that his motives were pure and that he acted only in the best interests of the two witnesses is an argu-

---

**3.** Reference should also be made to the later case of *United States v. Fayer,* 523 F.2d 661 (2 Cir. 1975). There, an acquittal of an attorney charged with violating § 1503 was upheld on the basis that the district court's findings concerning the defendant's motive in advising a witness not to testify before a grand jury were sufficiently ambiguous to render a remand for further findings on motive violative of double jeopardy principles as enunciated in *United States v. Jenkins,* 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975). The case clearly recognized the continuing vitality of *Cioffi,* however, and indicated that an attorney for one who has

violated the law may be guilty of violating § 1503 when he advises a prosecuting witness not to testify before a grand jury, and his motive is to protect his client as well as to safeguard the interests of the witness.

**4.** Although Baker was convicted by a jury, surprisingly, he did not have the district court's instructions to the jury transcribed. There is thus before us no question as to the correctness of the charge and, specifically, whether it comported with the meaning of § 1503 as we declare it in this opinion. These possible issues are waived.

ment properly addressable only to a jury which, as we hold, had a secure evidentiary base in the instant case to reject it.

### III.

■ Baker's claim of reversible error in the admission of testimony arises out of the following portion of the government's direct examination of F.B.I. Agent Schweickert concerning a meeting with Evelyn Watson prior to the time that she testified before the grand jury:

Q. Could you characterize her relationship with you at that time? What was her attitude?

A. I was most impressed with her. In fact, I conversed with her mother and her father and had been introduced to her daughter prior to making a decision.

MR. TUCKER: Move to Strike the opinion.

THE WITNESS: I am sorry.

THE COURT: OVERRULED.

THE WITNESS: As a result of the cordial welcome and what have you that I received and the manner in which she presented information to me—I interviewed a number of people—I concluded that she was honest with us. *She provided me information and answered all questions at that time very truthfully.*

MR. TUCKER: Move to Strike that last opinion.

THE COURT: I understood the question you asked was his impression as to what she was saying—the manner in which she provided certain information— is that correct?

MR. CRAWLEY: Yes, sir.

THE COURT: I will OVERRULE the objection.

I will instruct the jury that that is not—what he says the impression was is not evidence that what she told him in fact was true. It is not offered for that purpose. (Emphasis supplied.)

We think that the evidence was properly admitted. The jury was plainly told not to treat the testimony as evidence of the truthfulness of Watson's prior statements.

Indeed, those statements were never proved. With this admonition, the testimony was relevant to Baker's guilt. An element of the crime is an endeavor to impede a witness. As we have said, proof that the endeavor was successful is not a necessary element of the crime. But, conversely, proof that a witness was impeded has probative value and relevance as to whether an endeavor to impede was made. In showing that Watson was cooperative and apparently truthful before Baker reminded her of her right not to incriminate herself, but, as other evidence showed, she was uncooperative and untruthful thereafter, the government was attempting to establish an endeavor by Baker to impede Watson's testimony before the grand jury.

AFFIRMED.