State of Maryland v. Darrayl John Wilson, No. 64, September Term, 2019

**WITNESS TAMPERING – OBSTRUCTION OF JUSTICE – SPOUSAL TESTIMONIAL PRIVILEGE – MERGER –** Court of Appeals held that, where person married potential witness for State with intent to have witness invoke spousal testimonial privilege to prevent witness from testifying at criminal proceeding, evidence was sufficient to support convictions for witness tampering and obstruction of justice. Consistent with holding in Romans v. State, 178 Md. 588, 16 A.2d 642 (1940), cert. denied, 312 U.S. 695 (1941), and in accord with determinations of federal appellate courts, Court of Appeals concluded that conduct constituting corrupt means under obstruction of justice and witness tampering statutes may include conduct that is in and of itself legal. Court of Appeals determined that use of corrupt means involves acting with corrupt intent, *i.e.*, person uses corrupt means by marrying with intent to preclude another person from testifying at criminal proceeding, even though conduct involved (entering into marriage) is otherwise lawful. Applying holding to circumstances of case, Court of Appeals concluded that evidence was sufficient to support defendant's convictions for witness tampering and obstruction of justice given ample evidence that defendant married witness for State with corrupt intent of having her invoke spousal testimonial privilege at defendant's upcoming murder trial and therefore not be able to testify at trial.

Court of Appeals held that defendant's conviction for witness tampering did not merge for sentencing purposes with conviction for obstruction of justice due to anti-merger provision in witness tampering statute, Md. Code Ann., Crim. Law (2002, 2012 Repl. Vol., 2019 Supp.) ("CR") § 9-305. In light of plain language of CR § 9-305(d), it was not necessary to determine whether required evidence test mandated merger of defendant's convictions for witness tampering and obstruction of justice, and neither rule of lenity nor principle of fundamental fairness required merger.

Circuit Court for Charles County
Case No. C-08-CR-17-000048

Argued: September 14, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 64

September Term, 2019

_____

STATE OF MARYLAND

v.

DARRAYL JOHN WILSON

_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

_____

Opinion by Watts, J.

_____

Filed: October 26, 2020

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This case requires us to determine whether the evidence was sufficient to support a defendant's convictions for witness tampering and obstruction of justice where the evidence indicated that the defendant married a potential witness for the State to have the witness invoke the spousal testimonial privilege at his murder trial. We are also asked to decide whether the defendant's convictions for witness tampering and obstruction of justice merge for sentencing purposes.

The witness tampering and obstruction of justice statutes preclude the use of "corrupt means" to impede, among others, a witness in the performance of the witness's duties or to impede the administration of justice. Md. Code Ann., Crim. Law (2002, 2012 Repl. Vol., 2019 Supp.) ("CR") §§ 9-305(a), 9-306(a). In Maryland, the spouse of a person on trial for a crime may invoke the spousal testimonial privilege codified at Md. Code Ann., Cts. & Jud. Proc. (1974, 2013 Repl. Vol., 2019 Supp.) ("CJ") § 9-106(a), and, unless certain exceptions specified in the statute are satisfied, may not be compelled to testify as an adverse witness.

In this case, Kearra Bannister informed a law enforcement officer that her boyfriend, Darrayl John Wilson, Respondent/Cross-Petitioner, told her that he and Raymond Posey were involved in the murder of Crystal Anderson. In the Circuit Court for Charles County, the State, Petitioner/Cross-Respondent, separately charged Wilson and Posey with first-degree murder of Anderson and other crimes, initiating the cases of State v. Darrayl John Wilson, No. 08-K-15-000551 (Cir. Ct. Charles Cty.) ("Wilson I") and State v. Raymond Daniel Posey III, No. 08-K-15-000121 (Cir. Ct. Charles Cty.) ("Posey").

While incarcerated and awaiting the trial in Wilson I, Wilson engaged in multiple

telephone and video conversations with Bannister and others in which he indicated that he wanted to marry Bannister so that she could refuse to testify at his and Posey's trials. One day before the State was scheduled to call Bannister as a witness in Posey's trial, and eighteen days before the trial in Wilson I was scheduled to begin, Wilson and Bannister married via a telephone conversation with a pastor. While testifying at Posey's trial, Bannister attempted to invoke the spousal testimonial privilege. The circuit court ruled that she could not do so and required her to answer the prosecutor's questions. In Wilson I, before trial, the State filed a motion to preclude Bannister from invoking the spousal testimonial privilege, which the circuit court granted. Wilson later pled guilty to offenses in the case.

Subsequently, the State charged Wilson with witness tampering and obstruction of justice as to Wilson I and Posey on the ground that Wilson married Bannister to try to have her invoke the spousal privilege and thus preclude her from testifying in both cases. A jury found Wilson guilty of witness tampering and obstruction of justice as to Wilson I, but not guilty of witness tampering and obstruction of justice as to Posey. Wilson appealed. The Court of Special Appeals reversed the convictions for insufficient evidence, reasoning that the State failed to prove the "corrupt means" element of witness tampering and obstruction of justice. The State filed a petition for a writ of *certiorari*, and Wilson filed a conditional cross-petition for a writ of *certiorari*. This Court granted the petition and granted the conditional cross-petition as to one issue.

Before us, the State contends that the evidence was sufficient to support Wilson's convictions because, although marrying someone is a lawful act, Wilson married Bannister

- 2 -

with the corrupt intent of trying to make it possible for her to invoke the spousal testimonial privilege at trial in <u>Wilson I</u>. The State also argues that, because of an "anti-merger" provision in CR § 9-305, a conviction for witness tampering does not merge for sentencing purposes with a conviction for obstruction of justice. Wilson responds that he did not commit a crime by marrying Bannister and therefore his conduct does not satisfy the corrupt means element of the statutes. Wilson also contends that, if the evidence is sufficient to sustain his convictions, his conviction for witness tampering should merge for sentencing with his conviction for obstruction of justice under the required evidence test, the rule of lenity, and the principle of fundamental fairness.

Below, in Part I, we conclude that, where a person marries a potential witness for the State with the intent to enable the witness to invoke the spousal testimonial privilege at a criminal proceeding, the evidence is sufficient to support convictions for witness tampering and obstruction of justice. Consistent with our holding in <u>Romans v. State</u>, 178 Md. 588, 16 A.2d 642 (1940), <u>cert. denied</u>, 312 U.S. 695 (1941), and in accord with the determinations of federal appellate courts, we conclude that conduct constituting corrupt means under the witness tampering and obstruction of justice statutes may include conduct that is in and of itself legal. We conclude that use of corrupt means involves acting with corrupt intent, *i.e.*, a person uses corrupt means by marrying with the intent to preclude another person from testifying at a criminal proceeding, even though the conduct involved—entering into a marriage—is otherwise lawful. Applying the holding to the circumstances of this case, we conclude that the evidence is sufficient to support Wilson's convictions for witness tampering and obstruction of justice given the ample evidence that

Wilson married Bannister with the corrupt intent of having her invoke the spousal testimonial privilege at his upcoming murder trial to prevent the State from compelling her testimony.

In Part II, we conclude that Wilson's conviction for witness tampering does not merge for sentencing purposes with his conviction for obstruction of justice in light of the anti-merger provision, CR § 9-305(d), which states: "A sentence imposed under this section may be separate from and consecutive to or concurrent with a sentence for any crime based on the act establishing the violation of this section." Given the plain language of CR § 9-305(d), it is not necessary to determine whether the required evidence test mandates merger of Wilson's convictions for witness tampering and obstruction of justice, and neither the rule of lenity nor the principle of fundamental fairness requires merger.

## BACKGROUND

### Trial and Sentencing

At trial, as a witness for the State, Detective John Elliott of the Charles County Sheriff's Office testified that, in August 2011, Anderson's mother reported her missing. Detective Elliott and another detective determined that Anderson was last seen alive at a party in Nanjemoy, Maryland, which occurred on July 26, 2011. In January 2012, the remains of a human body were found in a creek bed in Nanjemoy. In February 2012, a medical examiner identified the remains as Anderson's. The investigation of Anderson's murder went on for years. In August 2014, as part of the investigation, Detective Brian Buchanan of the Charles County Sheriff's Office interviewed Wilson's girlfriend, Bannister.

As a witness for the State, Detective Buchanan testified that, in August 2014, his supervisor informed him that an officer had responded to a domestic call in Nanjemoy, and that Bannister, who had been at the scene of the call, told the officer that she had information regarding Anderson's murder. Detective Buchanan's supervisor asked him to interview Bannister. He did so, and made a recording of the interview, which was admitted into evidence and played for the jury. During the interview, Bannister stated that, on July 25, 2011, Wilson told her that he and Raymond Posey intended to rob Anderson and take drugs and cash from her. Bannister indicated that, on July 26, 2011 (the date of Anderson's death, according to the indictments), on multiple occasions, she telephoned Wilson, who did not answer. Bannister stated that, days later, Wilson and Posey had drugs and cash, and were burning clothes and selling guns and other items. According to Bannister, Wilson told her that he and Posey were involved in Anderson's murder.

The circuit court admitted into evidence indictments showing that grand juries separately indicted Posey and Wilson for first-degree murder and other crimes. Specifically, on June 19, 2015, in the circuit court, the State filed an indictment against Wilson, initiating Wilson I. Detective Elliott testified that, from July 2015 through at least February 2017, Wilson was incarcerated at the Charles County Detention Center, awaiting the trial.

The circuit court admitted into evidence notices of when the circuit court scheduled the trials in Posey and Wilson I to begin. On October 6, 2016, the circuit court scheduled the trial in Posey to begin on February 6, 2017. On October 27, 2016, the circuit court scheduled the trial in Wilson I to begin on February 27, 2017.

The circuit court admitted into evidence recordings of multiple telephone conversations and video visits in which Wilson participated with Bannister and others while he was incarcerated and awaiting trial. The recordings were played for the jury. On December 5, 2016, Wilson telephoned his cousin, Takiya Washington, who said that she had "asked the big question" of Wilson's "baby mama." Wilson responded: "What?" Washington responded: "Uuuuuh, jump the broom."[1] Shortly afterward, Washington said: "I said[: 'W]ell you gonna have to, you know, you gonna have to get married.[']  She said[: ']I know.[']"

On December 7, 2016, Wilson and Bannister engaged in a video visit. Wilson said that Washington had told him that she had asked Bannister whether she would marry him. Wilson said: "[Y]ou gotta[] do it. I'm in here." Bannister laughed and responded: "Ok. I'll do it."

On December 19, 2016, Wilson telephoned Bannister, who said: "That thing we w[ere] talking about costs six hundred fifty dollars[.]" Bannister indicated that "for the person to come, well I guess I could, I don't know anybody out here to do it." Shortly afterward, Wilson said: "They can't come here to do it." Bannister responded: "They can't visit with you on my visit."

On December 22, 2016, Wilson telephoned Bannister, who said that she had only $200. Wilson asked how Bannister would do "[w]hat [she] said [she] was gonna do." Bannister responded: "You say what?" Wilson responded: "Get them papers and stuff."

---

[1] "'[J]umping the broom' [is] a folk rite of marriage[.]" Alexander v. Haley, 460 F. Supp. 40, 45 n.6 (S.D.N.Y. 1978) (citation omitted).

Bannister responded: "I already got the papers." Wilson asked whether Bannister had "fill[ed th]em out[.]" Shortly afterward, Bannister asked: "You talking about the license?" Wilson responded: "Yeah."

On December 30, 2016, Wilson and Bannister obtained a marriage license even though evidence at trial indicated that Bannister had a boyfriend at the time.

On the same day, Wilson telephoned Bannister, who said: "[W]e just gotta keep money on the phone. And do it like that . . . [a]s soon as possible." Wilson responded: "Yeah." Bannister said: "Before, uh, your case again." Wilson responded: "Yeah, yeah, yeah, yeah, yeah, yeah[.]"

On January 2, 2017, Wilson telephoned Bannister, who asked what Washington had "to do with the thing[.]" Wilson responded: "She do[es]n't, but you really can't talk to me about it." Bannister said: "I know." Wilson responded: "And I really can't talk to her about it." Later on the same day, Wilson telephoned Washington. Wilson said that Bannister was "supposed to be tryin to get [Washington] to see" whether Wilson's aunt could "do the thing." Washington responded: "Oh, um, the license?" Wilson responded: "She already got that."

On January 9, 2017, Wilson telephoned Bannister and said that his trial would begin on February 27, 2017 and was "supposed to last a week." Later on during the call, Bannister asked: "[W]hat about that, though?" Wilson responded: "What?" Bannister responded: "Never mind[.]" Wilson responded: "Oh[.]" Bannister said: "I'm just (inaudible)[.]" Wilson responded: "Um, the phones are recorded[.]" Bannister responded: "I know[.]" Wilson said: "I'm just waiting on y'all."

- 7 -

On January 14, 2017, Wilson telephoned his mother, Dawn Wilson. Wilson said: "[Y]'all gotta hurry up and set the thing up before I end up down the hole[,[2]] and then it do[es]n't get done." Wilson's mother responded: "I just have one question, though." Wilson said: "You can ask the question after March." Wilson's mother asked why. Wilson responded: "Because my trial will be over in March."

At trial, the circuit court admitted into evidence a line that was filed in Wilson I, requesting entry of the appearance of Antoini M. Jones as Wilson's attorney. On January 19, 2017, Wilson telephoned his mother, who said that Jones said that Wilson did not "need to follow through with that, now." (Emphasis omitted). Wilson responded: "What?" Shortly afterward, Wilson's mother said: "The license[.]" (Emphasis omitted). Wilson asked: "What happened?" Wilson's mother responded: "(unintelligible) He said it can just be on stand-by, but there's no need for it right now. They're not, um, you know[—]wasn't subpoenaed. You hear me?" (Emphasis omitted). Wilson responded: "Remember the last time we went to court[? H]e said they could do that at any time."

On January 20, 2017, Wilson telephoned an unidentified woman,[3] who said that she would ask Wilson's mother to "call the lawyer and ask the lawyer why he sa[id that] he told [Wilson's mother] (inaudible) that y'all didn't have to do that." Wilson responded: "[H]e told me that we w[ere] supposed to been doin[g] it when he came down here and

---

[2]Detective Elliott testified that, at the Charles County Detention Center, if an inmate violates a rule, the inmate is sent to "the hole," where there are fewer privileges. For example, an inmate who is in "the hole" cannot make telephone calls or have video visits.
[3]In multiple instances, the transcripts of recordings of telephone conversations indicate that Wilson spoke with an unidentified woman.

talk[ed] to me."  Wilson also said: "He told [Bannister] that we w[ere] supposed to been doin[g] it."  Shortly afterward, the woman said: "[H]e says he know[s] somebody that will do it.  We w[ere] gonna say it wasn't no problem.  All you have to do is tell him when."  Wilson responded: "They need to hurry up and tell him when because the trial is right next month."  (Emphasis omitted).  Shortly afterward, Wilson said: "[T]he State like[s] to play tricks on people, like[s] to play games[,] act[s] like they not gonna do something and then do it at the last minute . . . , so we should do it and be prepared anyway."  (Emphasis omitted).

On January 21, 2017, Wilson telephoned an unidentified woman, who said that Wilson's mother said that a lawyer "said they're not gonna call that girl.  She's on the other boy's side."  Wilson responded: "That's a lie because, [] the first time I went to court, they said, they said they w[ere] gonna call her, so why would they just change all the sudden?  That do[es]n't even make sense."  The woman responded:

> She was a key witness the first time.  She [is] not gonna be the key witness this time.  That's what he said.  I don't know.  [Your mother] said she's gonna call back up there.  So, I don't know.  But he told [your mother], he said don't worry about it.  If push comes to shove, if he has to do it, he got somebody to do it for him.

Shortly afterward, the following exchange occurred:

> [Woman]: I'll tell [your mother] that you want to talk to the lawyer and you can talk to him and tell him what you think or whatever.  Uh, see what he say[s], but he just called [your mother] yesterday, the day before yesterday and t[old] her don't worry about nothin[g].  Don't worry about getting nobody to watchucall.  [Your mother] said somethin[g] about that.  Bill Cosby's wife, uh, they made her testify, but he said, this[—]
>
> [Wilson]: Yeah, she's looking for ways to avoid it, having it, that's probably why he's telling her not to worry about it because she's f[***]ing stupid.

- 9 -

She's needs to not worry about other dumb stuff and focus on the goal.  What is wrong with her?

[Woman]: Naw, she's, [Bannister]'s gonna be the key witness.

[Wilson]: Hey, don't, man, you cannot say stuff like that on the phone.

[Woman]: He said she's gonna be the key witness for the other boy.  And they not gonna put her on the stand.  That's what he said.

[Wilson]: (inaudible) get on the stand.  You can't say dumb s[***] like that on the phone.

[Woman]: How am I gonna tell you what he said?  I'm gonna tell you something other else that he said, (inaudible) get whatchucall to call him and ask him to come down there and talk to you again.  You can tell him what you think.  After all we done paid him.  He can't refuse to talk to you.

[Wilson]: She's not even gonna tell him nothing because she's against what is supposed to be happening.

(Paragraph break added).

On January 25, 2017, Wilson telephoned his mother and said: "I think you guys should hurry up and get together and do it because I can go down the hole any day and I won't be able to do it because I won't be able to get on the phone[.]"  (Emphasis omitted).  On February 1, 2017, Wilson telephoned his mother again and said: "[T]ell [Jones] to get the person that he said that he could get to do it."  (Emphasis omitted).

On February 3, 2017, Wilson telephoned his mother, who said: "I know[] what you want, but they said everything was going gravy, you know.  And it was.  They had everything there, but then w[ere] sayin[g] something about charges [or] whatever."  Shortly afterward, Wilson said: "Time is ticking away."  (Emphasis omitted).  Later, Wilson said: "For real[,] man, time, time's getting away[.]"  (Emphasis omitted).  Shortly afterward,

Wilson said: "I could be sent down the hole any day. I could get in a fight any day and be sittin[g] in the hole and it won't happen." (Emphasis omitted).

On February 4, 2017, Wilson telephoned Bannister. Wilson said: "I was under the impression that whoever was going to go ahead and set it up or whatever, but clearly it's not like that. You gotta call and do it yourself." (Emphasis omitted). Later on the same date, Wilson telephoned an unidentified woman. Wilson indicated that Bannister had met with Jones the previous day. The woman asked: "What [did] he say, go right ahead?" (Emphasis omitted). Wilson responded: "Yeah." (Emphasis omitted).

On February 5, 2017, Wilson telephoned Bannister, who said: "I'm gonna have to make that phone call myself[.]" On February 6, 2017, Wilson telephoned Bannister, who said: "I talked to somebody (inaudible), so, I need you to think about when you gonna call me and lock down[.]" Wilson asked: "What day?" Shortly afterward, Bannister said: "Today or tomorrow."

On February 7, 2017, Wilson telephoned Bannister and said: "[Y]our mother gotta go, but you don't gotta go to court." Bannister responded: "I do. But, I didn't get [a] thing." Shortly afterward, Bannister said: "I have to go on Friday." Friday was February 10, 2017.

On February 8, 2017, Wilson telephoned Bannister, who said: "She said we gotta do it tomorrow between 10 and 1." Wilson indicated that he would be available the following day at 10 a.m. or 12 p.m. Later on the same date, Wilson telephoned his mother, who asked: "[D]id y'all get everything done today?" Wilson responded: "No." Wilson's mother asked: "What happened?" Wilson responded: "I don't know. She said she gotta

do it tomorrow or something." Wilson's mother asked: "Who, um, Aunt Violet?" Wilson responded: "Yeah." Shortly afterward, Wilson said: "So much like (inaudible) waiting for the last minute."

On February 9, 2017, at 10:16 a.m., Wilson telephoned Bannister. Shortly after the call began, Pastor Roy Brown of Manna From On High Ministries in New Jersey and his wife, Violet Brown, began participating in the telephone conversation from an unknown location. Pastor Brown said: "What we're going to do is just a simple wedding ceremony that you -- you need to know that you [are] going to have to do this again in about two or three months when you're out." Violet Brown said that there had to be "two witnesses." Bannister indicated that someone named Jamie was on the phone with her. Pastor Brown conducted a brief marriage ceremony during the telephone call. At the end of the call, Pastor Brown said: "And that concludes the wedding ceremony. And like I said before, we still need to do it again when you [are] able to." The circuit court admitted into evidence a "Marriage Certificate[,]" which Pastor Brown signed, indicating that, on February 9, 2017, at 10:30 a.m., he presided over Wilson's and Bannister's marriage in La Plata, Maryland. Detective Elliott testified that the Charles County Detention Center is in La Plata.

On February 10, 2017, Wilson telephoned Bannister and the following exchange occurred:

[Bannister]: So, I didn't get a subpoena in my hand and I didn't get [any]thing at my house and I changed my address. And they called me to come to court today and I didn't get a subpoena (inaudible) but I don't want [any]body coming and looking for me.

- 12 -

[Wilson]: You said [that you] did what?

[Bannister]:  I said, I don't want [any]body coming and looking for me.

[Wilson]: And you said you did what to say they didn't need you [any]more?

[Bannister]: I didn't get [a] subpoena this time.  I haven't been to my mom's house because I don't live there.  I changed my address and all that back in January.  But they called me like they needed me, like [they] wanted me to come in.  But, she said she was gonna mail me a subpoena, but she never did, so I assumed that they don't need me anymore.  But, I don't want [any]body coming looking for me.

[Wilson]: I don't think that you can testify anyway because we married and you'll be, I don't know, I don't think[—]

[Bannister]: I'm talking about for today for [Posey.]

[Wilson]: I know, but still, even though it's for his, I don't think you can because it's involving me.

[Bannister]: I gotta send the, uh, a copy of the certificate to somebody real quick.

[Wilson]: Alright, and call up there and see if they know [whether] they can still make you do that on either one of us.  You know what I'm talking about?

[Bannister]: Yeah.  They said I should be good, though.

[Wilson]: For both of them, right?

[Bannister]: No.

[Wilson]: Oh, well, I don't know.

(Emphasis omitted).

On February 11, 2017, Wilson telephoned his mother and the following exchange occurred:

[Wilson's Mother]: [Your aunt] called me last night.  She didn't know what address to put on there, because it asks for where it took place at[.]

- 13 -

[Wilson]: Yeah.

[Wilson's Mother]: She didn't know, she wasn't sure about the address and stuff. [Bannister] called Jones, and he said, um, Charles County, put, um, La Plata.

[Wilson]: So, Ma, since, since, . . . I'm not sure about this, right. So, so, so, so since that happened, do[es]n't that mean she can't say anything in either, in either case?

[Wilson's Mother]: What?

[Wilson]: Doesn't that mean that she can't say anything at either court date?

[Wilson's Mother]: That's what I'm saying. That's what I'm thinking, Darrayl. [Bec]ause she said, she told me yesterday that the people called her and said she had to, uh, said she had to go that she had to come in Monday or she said there would be a bench warrant for her arrest. But, [by] the same token, [your aunt] took a picture of the license and sent it to Jones. Then Jones just told them, like this is, you know, she can't, you know[.]

(Ellipsis in original) (emphasis omitted).

The circuit court admitted into evidence a redacted transcript of testimony in Posey's trial that took place on Monday, February 13, 2017, when the State called Bannister as a witness. During direct examination by the prosecutor, Bannister testified that she and Wilson had gotten married the previous Thursday and attempted to invoke the spousal privilege. The circuit court indicated that Bannister did not have such a privilege as to Posey and directed her to respond to the prosecutor's questions.[4]

---

[4]Before trial in <u>Wilson I</u>, the State filed a "Motion to Preclude Assertion of Spousal Privilege" as to Bannister. <u>Darrayl John Wilson v. State</u>, No. 1122, Sept. Term, 2017, 2018 WL 3025896, at *1 (Md. Ct. Spec. App. June 18, 2018). The circuit court conducted a hearing and granted the motion, determining that Wilson's and Bannister's marriage was invalid and that she could not invoke the spousal testimonial privilege. <u>See id.</u> Wilson

- 14 -

In this case, after the State rested its case, Wilson's counsel moved for judgment of acquittal. Wilson's counsel acknowledged that Wilson and Bannister wanted to marry before her testimony at the trials in <u>Posey</u> and <u>Wilson I</u>, and that neither Wilson nor Bannister wanted her to testify in either case. Wilson's counsel asserted that Wilson and Bannister believed that attempting to use the spousal privilege was lawful, based on the advice of Jones (Wilson's counsel in <u>Wilson I</u>) and that Wilson did not pressure Bannister to marry him against her will. The prosecutor responded that it is obstruction of justice to engage in an otherwise lawful act with the intent to prevent a witness from testifying. After hearing argument, the circuit court denied the motion for judgment of acquittal, stating: "[T]he evidence clearly indicates that the purpose of the proposal and the marriage between [] Wilson and [Bannister] was so that she wouldn't testify. . . . [I]t becomes a jury question as to whether or not that is [] corruption within the definition of [CR §§] 9[-]305 and 9[-]306."

The only exhibit that Wilson offered into evidence was a copy of a "Marriage Certificate" that had been previously issued to Wilson and Bannister on February 12, 2015. After Wilson rested, his counsel renewed the motion for judgment of acquittal and the circuit court denied the motion for the reasons previously stated.

---

appealed the circuit court's determination while awaiting trial in <u>Wilson I</u>. <u>See id.</u> In the Court of Special Appeals, the State filed a motion to dismiss the appeal on grounds of lack of standing and lack of a final judgment or other appealable order. <u>See id.</u> The Court of Special Appeals granted the motion to dismiss. <u>See id.</u> Wilson filed a petition for a writ of *certiorari*, which this Court denied. <u>See Wilson v. State</u>, 461 Md. 508, 194 A.3d 949 (2018). Wilson later pled guilty.

When instructing the jury, the circuit court stated that, to obtain a conviction for witness tampering, "the State must prove that the defendant used corrupt means, that the defendant acted to influence or impede [] Bannister, a witness, in the performance of her official duties, and the action . . . was in connection with a proceeding involving a crime of violence." The circuit court did not define the term "corrupt means." After deliberations began, the jury submitted a question regarding the definition of the term "corrupt means." The circuit court responded by providing the jury with copies of, and reading aloud, the following supplemental jury instruction:

> "Corruption" is defined as a vicious and fraudulent intention to evade the prohibitions of the law. The phrase "corrupt means" refers to an act or actions done with an intent to give the actor some advantage inconsistent with the official dut[ies] and rights of others. To do an act corruptly is to commit it with the unlawful purpose of impeding the administration of justice or of influencing or impeding a witness in the performance of his [or her] official duties. "Corrupt means" may include otherwise lawful acts (such as sending a witness out of State during the time of trial) as well as otherwise unlawful acts (such as pointing a gun at a witness) if the acts were committed with the specific intent to obstruct or impede the administration of justice, or with the specific intent to influence, intimidate, or impede a witness from testifying.

The jury found Wilson guilty of witness tampering and obstruction of justice as to Wilson I, but not guilty of witness tampering and obstruction of justice as to Posey. The circuit court sentenced Wilson to twenty years of imprisonment, with all but three and a half years suspended, for witness tampering, and three and a half years of imprisonment concurrent for obstruction of justice, followed by five years of supervised probation. Wilson appealed.

**Opinion of the Court of Special Appeals**

On July 30, 2019, the Court of Special Appeals reversed Wilson's convictions for lack of sufficient evidence. See Wilson v. State, 241 Md. App. 683, 684-85, 213 A.3d 655, 656 (2019). The Court of Special Appeals concluded that the State failed to prove the "corrupt means" element of witness tampering and obstruction of justice as there is no sham marriage exception to the invocation of the spousal privilege in Maryland. See id. at 687, 213 A.3d at 658. The Court of Special Appeals stated "that, even assuming [that Wilson] entered into a sham marriage for the purpose of allowing [] Bannister to invoke [the] spousal privilege, his actions and intentions do not satisfy the 'corrupt means' element of 'witness tampering' or 'obstruction of justice.'" Id. at 687, 213 A.3d at 658 (footnote omitted). The Court of Special Appeals explained that it would "follow the out-of-state courts that have declined to create a judicial exception to the spousal privilege and hold that a spouse may invoke the privilege even in the context of a sham marriage." Id. at 687, 213 A.3d at 658. The Court of Special Appeals indicated that, "in Maryland, if the parties are validly married, a spouse may invoke the spousal privilege codified at CJ[] § 9-106, subject to the exceptions expressly provided in [CJ] § 9-106(a)(1) and (2)." Id. at 702, 213 A.3d at 667.

The Court of Special Appeals stated:

[I]n many states, engaging in a fraudulent marriage for the sole purpose of shutting up a witness is a statutorily sanctioned means to prevent a witness from testifying. Those states simply require a valid marriage in order to invoke the privilege—it is irrelevant for purposes of the privilege whether the marriage serves a fraudulent purpose. In light of our adoption of the prevailing rule, we fail to see how the act of marrying for the express purpose of invoking the privilege can constitute "corrupt means" witness tampering

or obstruction of justice. In short, a person cannot be guilty of "corrupt means" witness tampering or obstruction of justice where the allegedly criminal act—marrying with the express purpose of invoking the spousal privilege—is recognized as a lawful and permissible means for the new spouse to avoid being compelled to testify.

We recognize that this rule creates an obvious potential for mischief. Nevertheless, there is currently no "sham marriage" exception to the spousal privilege set forth in CJ[] § 9-106, and we decline to create a judicial exception. Any amendment to CJ[] § 9-106 must come from the General Assembly.

Wilson, 241 Md. App. at 703-04, 213 A.3d at 667-68 (cleaned up).

## Petition for a Writ of *Certiorari* and Conditional Cross-Petition

On September 17, 2019, the State petitioned for a writ of *certiorari*, raising the following two issues:

1.     Regardless [of] whether a collusive marriage confers spousal testimonial privilege, is evidence that the defendant-spouse arranged to marry in order to suppress the witness-spouse's testimony under the cloak of privilege sufficient to satisfy the "corrupt means" element of the obstruction of justice and witness tampering statutes?

2.     As a matter of first impression in Maryland, is a party to a collusive marriage precluded from invoking the spousal testimonial privilege?

Wilson conditionally cross-petitioned for a writ of *certiorari*, raising multiple questions.

This Court granted the petition in its entirety and granted the conditional cross-petition, limited to the following question:

If Wilson's convictions are affirmed, does his conviction and sentence for witness tampering merge into his conviction and sentence for obstruction of justice, where both convictions are predicated upon one act – marrying [] Bannister, his longtime girlfriend and the mother of his two children?

See State v. Wilson, 466 Md. 546, 222 A.3d 1071 (2020).

## DISCUSSION

## I. Sufficiency of the Evidence

## The Parties' Contentions

The State contends that, as used in the statutes that govern witness tampering and obstruction of justice, the term "corrupt means" includes otherwise lawful conduct that a defendant undertakes with corrupt intent, *i.e.*, the intent to impede the administration of justice or a witness. The State maintains that, even if Wilson's and Bannister's marriage entitled her to invoke the spousal testimonial privilege, the evidence showed that Wilson acted with corrupt intent when he persuaded Bannister to marry him so that she could attempt to invoke the privilege, and that this Court need not reach the question of the validity of the marriage.

Wilson responds that it is not fraudulent or corrupt for two people to marry for the purpose of enabling one of them to invoke the spousal testimonial privilege. Wilson points out that CJ § 9-106(a), which sets forth the spousal privilege, does not include an exception for sham marriages. Wilson contends that most of the courts in other jurisdictions that have addressed the issue have held that, where two people would not have married but for criminal charges against one of them, the other person may still invoke the spousal testimonial privilege. In sum, Wilson asserts that he entered into a valid marriage with Bannister and that his conduct does not satisfy the corrupt means element of witness tampering and obstruction of justice.

## Standard of Review

In <u>Fuentes v. State</u>, 454 Md. 296, 307, 164 A.3d 265, 272 (2017), this Court

- 19 -

described the standard of review of the sufficiency of the evidence as follows:

> In determining whether the evidence is legally sufficient, we examine the record solely to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In examining the record, we view the State's evidence, including all reasonable inferences to be drawn therefrom, in the light most favorable to the State.

(Cleaned up).

## Witness Tampering and Obstruction of Justice under Maryland Law

The witness tampering and obstruction of justice statutes proscribe, among other things, impeding a witness or the administration of justice, and any attempt to do so, using corrupt means. CR § 9-305(a) states: "A person may not, by threat, force, or corrupt means, try to influence, intimidate, or impede a juror, a witness, or an officer of a court of the State or of the United States in the performance of the person's official duties." CR § 9-306(a) states: "A person may not, by threat, force, or corrupt means, obstruct, impede, or try to obstruct or impede the administration of justice in a court of the State." No Maryland statute defines the term "corrupt means." And, no Maryland case law expressly defines the term. Nor does Maryland Criminal Pattern Jury Instruction 4:25 (Obstruction of Justice -- Jurors, Witnesses, or Officials), the Comment to which states in pertinent part:

> The Committee has not defined or explained the word "corrupt," believing that it, by itself, connotes its meaning better than a definition would. *See United States v. Reeves*, 752 F.2d 995, 998 (5th Cir. 1985) (defining ""corruptly" as an act "done *with an intent to give some advantage* inconsistent with the official duty and rights of others" (emphasis in original) (quoting United States v. Ogle, 613 F.2d 233, 238 (10th Cir. 1979))); *United States v. Ryan*, 455 F.2d 728, 734 (9th Cir. 1971) (defining "corrupt" as with []"evil or wicked purpose" and stating that "[s]pecific intent to impede the administration of justice is an essential element").

(Last alteration in original).

- 20 -

Although no Maryland statute defines the term "corrupt means," where a term is not defined by statute, we may refer to the dictionary and give the words their ordinary meaning. See Baltimore City Det. Ctr. v. Foy, 461 Md. 627, 645, 197 A.3d 1, 11 (2018). Black's Law Dictionary defines the word "corrupt," as, in pertinent part, "[h]aving unlawful or depraved motives; given to dishonest practices, such as bribery." *Corrupt*, Black's Law Dictionary (11th ed. 2019). Similarly, Merriam-Webster defines the word "corrupt," as "morally degenerate and perverted : DEPRAVED" or "characterized by improper conduct (such as bribery or the selling of favors)[.]" *Corrupt*, Merriam-Webster (2020), https://www.merriam-webster.com/dictionary/corrupt [https://perma.cc/8TQS-KW89]. Another definition of the word "corrupt" is "[h]aving or showing a willingness to act dishonestly in return for money or personal gain." *Corrupt*, Lexico/Oxford English and Spanish Dictionary, Thesaurus, and Spanish to English Translator (2020), https://www.lexico.com/en/definition/corrupt [https://perma.cc/J957-P36E]. These dictionary definitions of the word "corrupt" support the State's position that obstruction of justice may involve a wide range of conduct, including conduct that alone may not be illegal but is undertaken with the intent or purpose to impede a witness or obstruct justice.

In accord with the dictionary definitions of the word "corrupt," the case of Romans, 178 Md. 588, 16 A.2d 642, demonstrates that conduct constituting witness tampering and obstruction of justice may include conduct that is in and of itself legal but is undertaken with the intent to obstruct justice. In Romans, id. at 591, 600, 16 A.2d at 644, 648, this Court affirmed the convictions of two co-defendants for obstruction of justice under a statute that was a predecessor of CR §§ 9-305 and 9-306. At that time, the same statute

- 21 -

prohibited both witness tampering and obstruction of justice, stating in pertinent part:

> If any person shall corruptly or by threats or force endeavor to influence, intimidate or impede any juror, witness or officer in any court of this State in the discharge of his [or her] duty, or shall corruptly or by threats or force obstruct or impede, or endeavor to obstruct or impede, the due administration of justice therein, he [or she] shall be liable to be prosecuted[.]

Id. at 591, 16 A.2d at 644 (quoting Md. Code Ann., Art. 27 (1939) ("Art. 27 (1939)"), § 30).

In Romans, 178 Md. at 595, 16 A.2d at 645, in a separate criminal case in Baltimore City, the State charged two men with performing an abortion, which was a crime at the time. The co-defendants in Romans, a man and a woman, allegedly tried to influence the woman who had the abortion to leave the city and stay away until after the trial of the two men. See id. at 598, 593, 16 A.2d at 647, 644. The male co-defendant engaged in negotiations with the woman's grandmother to arrange for the woman to go away until after the trial. See id. at 598, 16 A.2d at 647. The woman's brother acted as the intermediary between the grandmother and the male co-defendant. See id. at 598, 16 A.2d at 647.

The woman informed law enforcement officers of the negotiations between her grandmother and the male co-defendant. See id. at 598-99, 16 A.2d at 647. The officers and the woman's brother planned a sting in which the brother would arrange to meet with the male co-defendant and inform the lead investigator of the time and place of the meeting so that officers could arrest the male co-defendant. See id. at 599, 16 A.2d at 647. The sting was carried out, and officers arrested the male co-defendant and found incriminating documents on him. See id. at 599, 16 A.2d at 647.

The State charged both co-defendants with violating Art. 27 (1939), § 30. See id. at 591, 16 A.2d at 644. In the trial court, one of the co-defendants filed a demurrer, contending that the indictment was duplicitous in that it charged multiple offenses in the same count.[5] See Romans, 178 Md. at 591, 16 A.2d at 644. The trial court overruled the demurrer, conducted a bench trial, and found both co-defendants guilty. See id. at 591, 16 A.2d at 644.

The co-defendants appealed, and this Court affirmed. See id. at 600, 16 A.2d at 648. This Court held that the trial court did not err in overruling the demurrer and emphasized that obstruction of justice may include a wide variety of conduct. See id. at 592, 594, 16 A.2d at 644, 645. This Court explained:

> [Art. 27 (1939), § 30] is in aid and definition of a class of those criminal acts which are known to the common law as obstructions of justice. The words of the statute are general and embrace in comprehensive terms various forms of obstruction. Thus the particular acts are not specified but, whatever they may be, if the acts be corrupt, or be threats or force, used in an attempt to influence, intimidate or impede any juror, witness or officer in any court of the State in the discharge of his [or her] duty, there is an obstruction of justice. Likewise, if by acts of similar quality and nature the due administration of justice in any court shall either be impeded or obstructed or be so attempted, there is an obstruction of justice. Furthermore, it is quite clear that the corrupt act, or one of threat or force, employed to influence or intimidate or impede any such juror, witness or officer in the discharge of his [or her] duty in a court, must necessarily be, also, an endeavor to obstruct or impede in such court the due administration of justice.

Id. at 592, 16 A.2d at 644.

---

[5]A demurrer is "a motion to dismiss[.]" *Demurrer*, Black's Law Dictionary (italics omitted). "Duplicitous" means "alleging two or more matters in one plea; characterized by double pleading[.]" *Duplicitous*, Black's Law Dictionary.

This Court's holding in <u>Hitzelbeger v. State</u>, 173 Md. 435, 196 A. 288 (1938), a case involving corrupt intent, also indicates that the conduct involved need not be criminal. In <u>Hitzelberger</u>, <u>id.</u> at 443, 196 A. at 292, this Court held that the evidence was sufficient to support a defendant's conviction for constructive contempt of court. After a grand jury began investigating vice in Baltimore City, the defendant, an officer of the Baltimore Police Department, met with one of the grand jurors, advised the grand juror that he was being framed, and gave the grand juror a list of witnesses who could testify on his behalf. <u>See id.</u> at 436-37, 443, 196 A. at 289, 292. This Court rejected the defendant's contention that he had no corrupt intent to influence the grand juror's actions. <u>See id.</u> at 443, 196 A. at 292. This Court explained that, if the charges were accurate, the defendant "attempt[ed] to get into the grand jury room witnesses favorable to him, in answer to the charges he had heard were being made against him[.]" <u>Id.</u> at 443, 196 A. at 292.

**Obstruction of Justice under Federal Law**

18 U.S.C. § 1503(a) prohibits obstruction of justice, stating in pertinent part: "Whoever . . . corruptly or by threats or force . . . influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished[.]" In <u>State v. Pagano</u>, 341 Md. 129, 137, 669 A.2d 1339, 1343 (1996), this Court stated that cases in which federal courts interpreted 18 U.S.C. § 1503 were "of particular relevance" to interpreting the version of CR § 9-306 that was effective at the time, given that CR § 9-306's original version "was identical to" 18 U.S.C. § 1503's original version, and that 18 U.S.C. § 1503 and CR § 9-306 were "still very similar." (Citation omitted). Today, 18 U.S.C. § 1503(a) and CR § 9-306(a) remain very similar, in that the statutes

- 24 -

prohibit "corruptly" or by "corrupt means" obstructing or impeding the administration of justice, respectively. Accordingly, as we did in Pagano, id. at 138-39, 669 A.2d at 1343, we look to federal case law in interpreting the obstruction of justice statute.

In United States v. Cioffi, 493 F.2d 1111, 1113 (2d Cir.), cert. denied, 419 U.S. 917 (1974), the United States Court of Appeals for the Second Circuit held that the evidence was sufficient to support a defendant's convictions for obstruction of justice and conspiracy to obstruct justice. A grand jury was investigating a loan with a usurious rate of interest. See id. at 1114-15. The lender expected the government to subpoena one of the borrowers to testify before the grand jury. See id. at 1115. The defendant—who was ostensibly an associate of the lender—met with the borrower and told him to invoke the privilege against self-incrimination. See id. at 1116. The government subpoenaed the borrower, who testified before the grand jury. See id. at 1113, 1115. The Second Circuit's opinion does not expressly indicate whether the borrower invoked or attempted to invoke the privilege against self-incrimination. In any event, the grand jury indicted the lender for making an "extortionate loan[.]" Id. at 1117. The defendant met with the borrower's uncle and wanted him to get the borrower to write a statement indicating that he had never been threatened or intimidated. See id. The government charged the defendant with obstruction of justice and conspiracy to obstruct justice, identifying the lender as a co-conspirator. See id. at 1113, 1115. A jury found the defendant guilty on both counts. See id. at 1113.

The defendant appealed, and the Second Circuit affirmed. See id. The Second Circuit rejected the defendant's contention that it is not obstruction of justice for a defendant to advise a witness to invoke the privilege against self-incrimination. See id. at

- 25 -

1119. The Second Circuit explained: "The focus is on the intent or motive of the party charge[d] as an inducer. The lawful behavior of the person invoking the [Fifth] Amendment [privilege against self-incrimination] cannot be used to protect the criminal behavior of the inducer." Id. The Second Circuit approvingly quoted jury instructions, which borrowed most of the following language from Cole v. United States, 329 F.2d 437, 443 (9th Cir.), cert. denied, 377 U.S. 954 (1964): "[W]hile a witness violates no law by claiming the . . . privilege against self-incrimination [before] a grand jury, one who bribes, threatens, [or] coerces a witness to claim it or advises with corrupt motive a witness to take it, can and does obstruct or influence the administration of justice." Cioffi, 493 F.2d at 1119. In Cioffi, id., the Second Circuit concluded that there was "ample evidence that the [defendant] endeavored to influence the" borrower.

In United States v. Cintolo, 818 F.2d 980, 1004, 983 (1st Cir.), cert. denied, 484 U.S. 913 (1987), the United States Court of Appeals for the First Circuit held that the evidence was sufficient to support a defendant's conviction for conspiracy to obstruct justice. A grand jury began investigating a gang's criminal activities. See id. at 984. The defendant in Cintolo was a lawyer who represented a witness who was to testify before the grand jury. See id. The defendant helped the gang leader and his associates pressure the witness not to testify. See id. at 989. The First Circuit rejected the defendant's contention that he could not be found guilty of conspiracy to obstruct justice because he had simply been obtaining information from the gang leader that he could use to represent the witness. See id. The First Circuit explained: "[A]ny act by any party—whether lawful or unlawful on its face—may [constitute obstruction of justice] if performed with a corrupt

- 26 -

motive." Id. at 991. The First Circuit determined that, although the defendant's "acts in fostering the intimidation of [the witness] were not in themselves overtly unlawful, they" could still be found by the jury to constitute conspiracy to obstruct justice. Id. at 993 (emphasis omitted).

### Spousal Testimonial Privilege

CJ § 9-106(a) governs the spousal testimonial privilege and states:

The spouse of a person on trial for a crime may not be compelled to testify as an adverse witness unless the charge involves:

(1) The abuse of a child under 18; or

(2) Assault in any degree in which the spouse is a victim if:

(i) The person on trial was previously charged with assault in any degree or assault and battery of the spouse;

(ii) The spouse was sworn to testify at the previous trial; and

(iii) The spouse refused to testify at the previous trial on the basis of the provisions of this section.

Before this case, neither this Court nor the Court of Special Appeals had, in a reported opinion, endeavored to resolve the question of whether a party to a sham marriage may invoke the spousal testimonial privilege. A "sham marriage" is "[a] purported marriage in which all the formal requirements are met or seemingly met, but in which the parties go through the ceremony with no intent of living together as spouses." *Sham Marriage*, Black's Law Dictionary.

Although the issue of whether a party to a sham marriage may invoke the spousal testimonial privilege is a matter of first impression, both this Court and the Court of Special

Appeals have commented on the issue in *dicta*. In <u>Hagez v. State</u>, 110 Md. App. 194, 211, 676 A.2d 992, 1000-01 (1996), the Court of Special Appeals observed that, because it "reverse[d] on other grounds[,]" it did not need to "resolve the thorny issue concerning" "whether the statutory testimonial privilege is available to a witness who has married solely to assert the spousal testimonial privilege or to obstruct justice." (Footnote omitted). That said, in a footnote, the Court of Special Appeals stated: "We note that the spousal privilege, codified in [CJ] § 9-106, does not seem to include any exceptions concerning an improper motive or purpose in marrying." <u>Id.</u> at 211 n.7, 676 A.2d at 1001 n.7.

In <u>State v. Walker</u>, 345 Md. 293, 295-96, 329-30, 691 A.2d 1341, 1342, 1358-59 (1997), this Court held that a trial court erred in admitting evidence of an out-of-court statement by the defendant's wife under the residual hearsay exception because we concluded that the spousal testimonial privilege was not an exceptional circumstance justifying admission of the hearsay statement. We explained:

> The [spousal testimonial] privilege itself does not preclude the admission of out-of-court statements made by the spouse prior to the marriage. . . . Lurking here, perhaps, is some discomfort with the fact that [the defendant] and [his wife] married after she made her statement but before trial. There have, to be sure, been cases in which the defendant and the witness have entered into a marriage immediately prior to trial, the inference being that the marriage was a sham, arranged solely to preclude the witness from testifying or having to testify. Most of those cases seem to have arisen under the common law rule that either made the spouse incompetent as a witness or allowed the defendant to preclude the testimony. *See* Michael G. Walsh, *Existence of Spousal Privilege Where Marriage Was Entered Into For Purpose of Barring Testimony*, 13 A.L.R.4th 1305 (1982). Some courts, in that circumstance, have refused to apply the privilege, although the prevailing rule seems to be, even in that circumstance, that the privilege applies. *Id.* at 1308.
>
> That problem is not before us in this case, however. The State has not contended that the marriage between [the defendant] and [his wife] was a

sham.

Walker, 345 Md. at 329-30, 691 A.2d at 1358-59.

**Analysis**

Here, we conclude that, where a person marries a potential witness for the State with the intent to have the witness invoke the spousal testimonial privilege at a criminal proceeding in order to prevent the witness from testifying at the proceeding, the evidence is sufficient to support convictions for witness tampering and obstruction of justice. This Court's holding in Romans, 178 Md. at 593, 598, 600, 16 A.2d at 644, 647, 648, and federal appellate case law support the conclusion that engaging in otherwise lawful conduct with the intent of trying to preclude a witness for the State from testifying at an upcoming criminal trial may constitute corrupt means under the witness tampering and obstruction of justice statutes. We conclude that the use of corrupt means involves acting with corrupt intent, *i.e.*, a person uses corrupt means by marrying with the intent to preclude another person from testifying at a criminal proceeding, even though the conduct involved— entering into a marriage—is otherwise lawful.

In Romans, 178 Md. at 600, 598, 593, 16 A.2d at 648, 647, 644, this Court affirmed co-defendants' convictions for obstruction of justice where the co-defendants attempted to arrange for a witness for the State in a criminal case in Baltimore City to leave town and stay away until after the conclusion of a trial in that criminal case. Obviously, arranging for another person to voluntarily take a trip is not, in and of itself, a crime. Yet, in Romans, that otherwise lawful act constituted obstruction of justice because the co-defendants had the corrupt purpose of trying to preclude the witness for the State from testifying at the

- 29 -

upcoming trial. Just as in <u>Romans</u>, where arranging for a witness for the State to take a trip for the purpose of precluding the witness from testifying satisfied the statutory requirement that the co-defendants behaved "corruptly," marrying a witness for the State for the purpose of trying to enable the witness to invoke the spousal testimonial privilege satisfies the "corrupt means" element of the witness tampering and obstruction of justice statutes.[6] The focus is on the intent underlying the conduct, and in keeping with our holding in <u>Romans</u>, we conclude that otherwise lawful conduct done with the intent to preclude a witness from testifying at a criminal proceeding satisfies the corrupt means element of the statutes.

We are aware that, when this Court decided <u>Romans</u>, 178 Md. at 591, 16 A.2d at 644, the statute that prohibited witness tampering and obstruction of justice used the word "corruptly" rather than the term "corrupt means," which CR §§ 9-305(a) and 9-306(a) use. This circumstance, however, does not affect our analysis because the word "corruptly" and the term "corrupt means" are essentially synonymous. Indeed, both are derived from the root word "corrupt." And, even after the General Assembly amended the statute to replace the word "corruptly" with the term "corrupt means," this Court and the Court of Special Appeals continued to rely upon <u>Romans</u> when discussing the range of

---

[6]At oral argument, Wilson's counsel contended that <u>Romans</u>, 178 Md. 588, 16 A.2d 642, is inapplicable because one of the co-defendants offered a bribe, in the form of a free vacation for the key witness for the State. Nowhere in <u>Romans</u>, however, did this Court state or imply that either co-defendant's conduct constituted bribery. And, in addition to our holding in <u>Romans</u>, this Court's holding in <u>Hitzelberger</u>, 173 Md. at 443, 196 A. at 292, demonstrates that otherwise lawful conduct—such as speaking to a grand juror—may constitute conduct done with corrupt intent.

conduct that may constitute obstruction of justice. <u>See</u> <u>Pagano</u>, 341 Md. at 136, 669 A.2d at 1342; <u>Pennington v. State</u>, 308 Md. 727, 734-35, 521 A.2d 1216, 1219-20 (1987); <u>Lee v. State</u>, 65 Md. App. 587, 591-92, 501 A.2d 495, 497-98 (1985).

Our conclusion is compelled not only by this Court's holding in <u>Romans</u> but is also supported by opinions from federal appellate courts that have interpreted the federal obstruction of justice statute, which is very similar to its Maryland counterpart. <u>See</u> <u>Pagano</u>, 341 Md. at 137, 669 A.2d at 1343. In <u>Cioffi,</u> 493 F.2d at 1119, the Second Circuit held that, although it is lawful for a government witness to invoke the privilege against self-incrimination, it is obstruction of justice for a defendant, with a corrupt motive, to advise a government witness to invoke the privilege. The focus is on the intent or motive of the defendant who is charged as an inducer.[7] <u>See</u> <u>Cioffi</u>, 493 F.2d at 1119. Plainly, the

---

[7]Wilson argues that it cannot be corrupt means for a defendant to exercise a right, such as the right to marry. In support of his argument, Wilson relies on <u>Arthur Andersen LLP v. United States</u>, 544 U.S. 696, 703-04 (2005), in which the Supreme Court stated:

> [P]ersuading a person with intent to cause that person to withhold testimony or documents from a Government proceeding or Government official is not inherently malign. Consider, for instance, a mother who suggests to her son that he invoke [the privilege] against [] self-incrimination, or a wife who persuades her husband not to disclose marital confidences[.]

(Cleaned up). Wilson's reliance on <u>Arthur Andersen</u>, <u>id.</u>, is misplaced. In that case, the Supreme Court interpreted 18 U.S.C. § 1512(b)(2)(A) and (B), which prohibit, in pertinent part, "'knowingly ... corruptly persuad[ing]' another person 'with intent to ... cause' that person to 'withhold' documents from, or 'alter' documents for use in, an 'official proceeding.'" <u>Id.</u> at 703 (ellipses in original). 18 U.S.C. § 1512(b) includes the word "knowingly," whereas 18 U.S.C. § 1503 does not. Under 18 U.S.C. § 1512(b)'s plain language, a violation of that subsection contains a unique *mens rea* element that a violation of 18 U.S.C. § 1503 does not. Indeed, in <u>Arthur Andersen</u>, 544 U.S. at 705 n.9, the Supreme Court pointed out that, because 18 U.S.C. § 1503 "lack[s] the modifier

inducer's behavior is corrupt—*i.e.*, a defendant's motive is corrupt—where he or she tries to preclude a witness from testifying for "self-serving" reasons. Cintolo, 818 F.2d at 989. For example, in Cioffi, 493 F.2d at 1119, the Second Circuit stated that "an endeavor to induce [a witness] . . . to plead the Fifth Amendment for the purpose of protecting [a defendant] was obviously corrupt." Similarly, in Cintolo, 818 F.2d at 989, the First Circuit rejected the defendant's factual argument that he had an "authentic motive" and "did not intend to obstruct justice," explaining "that the self-serving gloss which [the defendant] place[d] on the evidence manifestly misapprehend[ed] both the jury's factfinding function and our role in the review of the verdict."

Here, viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the State, we conclude that there is ample evidence that Wilson married Bannister for the purpose of trying to have her invoke the spousal testimonial privilege in Wilson I, *i.e.*, that Wilson married Bannister with the corrupt intent of preventing her from giving incriminating testimony against him at his upcoming murder trial.

Wilson was aware that Bannister was expected to be the key witness for the State at

---

'knowingly,' [] any analogy [is] inexact" with regard to 18 U.S.C. § 1512(b). Thus, although, in Arthur Andersen, the Supreme Court indicated that the scenarios that it described would not constitute "knowingly" corruptly persuading someone to withhold testimony, in violation of 18 U.S.C. § 1512(b), the hypotheticals do not furnish us with guidance in interpreting CR §§ 9-305 and 9-306, which, like 18 U.S.C. § 1503, lack the word "knowingly."

his trial. The State did not initiate Wilson I and Posey[8] until Detective Buchanan interviewed Bannister more than three years after Anderson's murder. Bannister indicated to Detective Buchanan that Wilson confessed to being involved in Anderson's murder and made other inculpatory statements. During a telephone conversation with an unidentified woman, while Wilson was incarcerated and awaiting trial, the unidentified woman said to Wilson that Bannister was "gonna be the key witness" at the trial in Posey. Wilson responded: "Hey, don't, man, you cannot say stuff like that on the phone." The circumstances set forth above and Wilson's response to the woman's statement give rise to the reasonable inference that he believed Bannister would be the key witness for the State at Posey's murder trial, and, by extension, at his trial.

In addition to the evidence that Wilson was aware of Bannister's status as the key witness for the State, the telephone conversations contain abundant evidence that Wilson wanted to marry Bannister to try to have her invoke the spousal testimonial privilege at the trial in his case. Tellingly, when referring to his and Bannister's marriage plans, Wilson almost always avoided referring to the upcoming marriage as a "marriage," and instead used euphemisms or code language such as "[g]et them papers[,]" "set the thing up[,]" "do it[,]" and "what is supposed to be happening." Wilson's oblique way of referring to his and Bannister's upcoming marriage gives rise to the inference that he was attempting to conceal that he wanted to marry Bannister from anyone who may have been listening to

---

[8]Although the jury found Wilson guilty of obstruction of justice and witness tampering only as to Wilson I, some of the circumstances of Posey are relevant because the State charged both Wilson and Posey with Anderson's murder and Bannister was expected to be a witness for the State in both cases.

the calls.

Telephone conversations after Wilson and Bannister married, but before the State called Bannister as a witness in Posey, strongly support the determination that Wilson married Bannister with the intent to enable Bannister to invoke the spousal testimonial privilege. During a telephone conversation after Wilson and Bannister married, he said to her: "I don't think that you can testify anyway because we married[.]" Bannister responded: "I'm talking about for today for [Posey.]" Wilson responded: "I know, but still, even though it's for his, I don't think you can because it's involving me." Wilson also told Bannister to "see if they know [whether] they can still make you do that on either one of us." It is reasonable to infer that Wilson was asking Bannister to seek information as to whether she could invoke the spousal testimonial privilege at his and Posey's trials.

During another telephone conversation after Wilson and Bannister married, his mother referred to the Marriage Certificate. Wilson asked his mother: "Doesn't that mean that she can't say anything at either court date?" It is reasonable to infer that Wilson was attempting to confirm with his mother whether, in light of their marriage, Bannister could invoke the spousal testimonial privilege at his or Posey's trial.

Last but not least, the timing of Wilson's and Bannister's marriage and the number of telephone calls leading up to the marriage support the determination that Wilson married Bannister with the intent of having her invoke the spousal testimonial privilege. During a telephone conversation before Wilson and Bannister married, she said: "[W]e just gotta keep money on the phone. And do it like that. . . . [a]s soon as possible. . . . Before, uh, your case again." Wilson responded: "Yeah, yeah, yeah, yeah, yeah, yeah[.]" Wilson's

response gives rise to the reasonable inference that he interpreted Bannister's statements to mean that they needed to get married by telephone before his upcoming trial, and that he agreed with her.

During another telephone conversation, Wilson said: "They need to hurry up and tell him when because the trial is right next month." (Emphasis omitted). Shortly afterward, Wilson said: "[T]he State like[s] to play tricks on people, like[s] to play games; act[s] like they not gonna do something and then do it at the last minute . . . , so we should do it and be prepared anyway." (Emphasis omitted). Wilson's statements give rise to the reasonable inference that he expected the State to call Bannister as a witness at Posey's trial as well as his, and that he wanted to marry her before then.

On February 6, 2017, the trial in Posey began. On February 7, 2017, during a telephone conversation, Bannister indicated to Wilson that the State would call her as a witness at the Posey trial on Friday, which was February 10, 2017. On February 8, 2017, during a telephone conversation, Wilson said something to his mother about "waiting for the last minute." On February 9, 2017, Wilson and Bannister married. On February 13, 2017, the State called Bannister as a witness in the Posey trial, and she attempted to invoke the spousal testimonial privilege. At the time that Wilson and Bannister married, the trial in Wilson I was scheduled to begin February 27, 2017, which was just eighteen days away. A total of twenty-eight telephone calls and video visits, in which Wilson discussed or alluded to the potential marriage and whether Bannister would be able to testify against him and Posey, took place between Wilson and Bannister and others between December 2016 and the February 9, 2017 marriage.

Together, all of these circumstances—Bannister's status as the key witness for the State and Wilson's knowledge of her status, Wilson's use of euphemisms or code language for his and Bannister's upcoming marriage, the content of telephone and video conversations before and after the marriage, the timing of the marriage, and the number of conversations that Wilson engaged in about the upcoming marriage—provided the jury with more than enough evidence to find that Wilson's intent was to enable Bannister to invoke the spousal testimonial privilege at his trial. Just as the defendants in Romans, 178 Md. at 600, 598, 593, 16 A.2d at 648, 647, 644, Cioffi, 493 F.2d at 1119, and Cintolo, 818 F.2d at 983, 993, obstructed justice by performing an otherwise lawful act (such as arranging for a witness to take a trip or advising a government witness to invoke the privilege against self-incrimination or not to testify) for the corrupt purpose of trying to preclude the witness from testifying at an upcoming criminal proceeding, here, there was more than enough evidence for the jury to find that Wilson performed an otherwise lawful act (marrying Bannister, a witness for the State) for the corrupt purpose of trying to preclude Bannister from testifying against him at the trial in Wilson I.

It is not dispositive that, ultimately, Bannister was unable to invoke the spousal testimonial privilege at Wilson's trial. CR § 9-305(a) prohibits using "corrupt means[ to] try to influence, intimidate, or impede . . . a witness[.]" Similarly, CR § 9-306(a) prohibits using "corrupt means[ to] try to obstruct or impede the administration of justice in a court of the State." The inclusion of the word "try" in the plain language of CR §§ 9-305(a) and 9-306(a) demonstrates the General Assembly's intent that an attempt—whether successful or not—to engage in witness tampering or obstruction of justice would constitute a

- 36 -

violation of the statutes.

The federal statute that prohibits obstruction of justice, and the case law regarding its interpretation, are instructive in this regard. Similar to CR §§ 9-305(a) and 9-306(a), 18 U.S.C. § 1503(a) proscribes "corruptly . . . endeavor[ing] to influence, obstruct, or impede[] the due administration of justice[.]" As the Fourth Circuit has pointed out, "the success or lack of success in endeavoring to influence such a witness is not in itself the determining factor in deciding whether [18 U.S.C. § 1503] has been violated." United States v. Baker, 611 F.2d 964, 967 (4th Cir. 1979). 18 U.S.C. § 1503 "requires only proof of an endeavor, irrespective of its success, and makes that act a crime if the endeavor is a corrupt one." Baker, 611 F.2d at 967. As such, in Baker, id., the Fourth Circuit noted that it was not dispositive that a government witness did not comply with the defendant's advice to invoke the privilege against self-incrimination. Similarly, here, there is ample evidence that Wilson's purpose in marrying Bannister was to attempt to preclude her from testifying at his trial, and that evidence is sufficient to support the convictions for witness tampering and obstruction of justice, even though Bannister did not assert the privilege at trial.

Just as it is immaterial that the circuit court ruled that Bannister could not invoke the spousal privilege at the trial in Wilson I, it is not dispositive whether a party to a sham marriage is precluded from invoking the spousal testimonial privilege. In other words, we need not answer the second question presented in the State's petition for a writ of *certiorari.* This question need not be answered because it does not matter whether Wilson's attempt to have Bannister invoke the privilege was successful or would have been successful. What matters is that the evidence was sufficient for the jury to find that Wilson married Bannister

- 37 -

with the intent to preclude Bannister from testifying. It is of no consequence to a determination of the sufficiency of the evidence whether Wilson's attempt to have Bannister use the privilege was founded on a correct or incorrect interpretation of the law as to whether Bannister could, in fact, invoke the spousal testimonial privilege at his trial. Indeed, although the State raised in the petition for a writ of *certiorari* the question of whether a party to a sham marriage may invoke the spousal testimonial privilege, at oral argument, the Assistant Attorney General acknowledged that this Court need not answer the question. We agree. Resolution of the question concerning the sufficiency of the evidence for Wilson's convictions for witness tampering and obstruction of justice does not require us to determine the legality of Wilson's marriage or whether Bannister was entitled to invoke the spousal testimonial privilege at his murder trial. Instead, the question of the validity of Wilson's convictions requires us to determine whether Wilson acted with "corrupt means" as required by both statutes, *i.e.*, whether the evidence was sufficient to support Wilson's convictions for witness tampering and obstruction of justice.

The United States Court of Appeals for the Ninth Circuit's decision in <u>Cole</u>, 329 F.2d at 443, illustrates our point. There, the Ninth Circuit held that the evidence was sufficient to support a defendant's conviction for obstruction of justice where the defendant instructed a government witness to invoke the privilege against self-incrimination before a grand jury that was investigating the defendant. <u>See id.</u> at 443-45. The Ninth Circuit noted that it did not need to decide whether "the policy of the law would uphold the privilege" against self-incrimination where a lawyer, doctor, or priest corruptly advised a witness to invoke the privilege. <u>Id.</u> at 440. Just as, in <u>Cole</u>, <u>id.</u>, where it was not determinative

whether a witness could invoke the privilege against self-incrimination, here, it is not dispositive whether Bannister could invoke the spousal testimonial privilege in <u>Wilson I</u>. Given that we need not answer the question of whether a party to a sham marriage may invoke the spousal testimonial privilege, we refrain from doing so.

In this case, irrespective of whether a party to a sham marriage may invoke the spousal testimonial privilege, it was up to the jury to determine whether Wilson's intent in marrying Bannister was to attempt to preclude her from testifying at his trial by trying to have her invoke the privilege, *i.e.*, whether Wilson acted with corrupt means. By finding Wilson guilty of witness tampering and obstruction of justice, the jury answered the question in the affirmative.[9] For a myriad of reasons, the evidence was sufficient to support Wilson's convictions for witness tampering and obstruction of justice.[10]

---

[9]Although, in this instance, the evidence was sufficient to support Wilson's convictions for both witness tampering and obstruction of justice, we note that this may not always be the case. With this opinion, we define the element of "corrupt means." The determination as to whether the evidence satisfies the elements of witness tampering— which are using "threat, force, or corrupt means" to "try to influence, intimidate, or impede . . . a witness . . . in the performance of the person's official duties[,]" CR § 9-305(a)—will necessarily be a fact-specific, case-by-case analysis. Under some circumstances, a defendant's conduct of marrying with the corrupt intent to "obstruct, impede, or try to obstruct or impede the administration of justice in a court of the State[,]" CR § 9-306(a), may not necessarily satisfy the elements of witness tampering.

[10]On a final note, to the extent that Wilson alleges that his conduct fails to satisfy the corrupt means element of the statutes because he married Bannister at least partly based on the advice of Jones, his counsel in <u>Wilson I</u>, the record belies this claim. At trial, the only indication that Jones may have advised Wilson concerning the marriage was a series of vague references to Jones during telephone conversations between Wilson and individuals other than Jones. And, while arguing in favor of the motion for judgment of acquittal, Wilson's counsel alleged only that Wilson had been following the advice of Jones "to some degree." In short, Wilson's contention regarding his alleged reliance on the advice of counsel is not supported by the record. Moreover, generally, the advice of

## II. Merger

### The Parties' Contentions

Wilson contends that the circuit court erred in not merging his conviction for witness tampering with his conviction for obstruction of justice for sentencing purposes, and that merger is warranted under the required evidence test, the rule of lenity, and the principle of fundamental fairness. Wilson argues that the legislative history of CR §§ 9-305(a) and 9-306(a) demonstrates that obstruction of justice can be committed in multiple ways, such as by impeding a juror, a witness, or an officer of the court, and as such, he committed only one crime. Wilson points out that, before 2002, a single statute prohibited the acts that CR §§ 9-305(a) and 9-306(a) now separately prohibit. Wilson indicates that the Revisor's Notes to the 2002 recodification, dividing the criminal acts into two new statutes, state that the General Assembly did not intend any substantive amendments at the time. Wilson also argues that the General Assembly intended CR § 9-305(d) to apply only where a defendant obstructed justice by committing a distinct crime, such as assault. In sum, Wilson contends that every violation of CR § 9-305(a) is necessarily a violation of CR § 9-306(a) as well because CR § 9-305(a) prohibits the same acts as CR § 9-306(a), only with greater detail.

The State responds that CR § 9-305(d) constitutes an anti-merger provision that

counsel is not recognized as a defense in criminal cases in Maryland. See Hopkins v. State, 193 Md. 489, 498, 69 A.2d 456, 460 (1949); Herd v. State, 125 Md. App. 77, 119 n.12, 724 A.2d 693, 714 n.12 (1999). Although not recognized as a defense, under certain circumstances, information concerning the advice of counsel may be admissible as evidence of a defendant's lack of criminal intent. See Hopkins, 193 Md. at 498, 69 A.2d at 460. But, in this case, the record failed to establish such lack of criminal intent.

permits separate sentences without the need to determine whether witness tampering is a lesser-included offense of obstruction of justice under the required evidence test. The State argues that, if the General Assembly had intended CR § 9-305(d) not to apply where a defendant was convicted of obstruction of justice and witness tampering, the General Assembly would have stated as much. The State asserts that, by dividing the relevant criminal acts between two new statutes in 2002, and by increasing the maximum sentence for witness tampering in 2005, the General Assembly demonstrated an intent to create two distinct crimes. The State maintains that witness tampering involves a harm that is distinct from the harm that results from obstruction of justice. The State contends that neither the rule of lenity nor the principle of fundamental fairness applies because the language of CR § 9-305(d) is unambiguous.

**Standard of Review**

An appellate court reviews without deference the question of whether a sentence is legal. See Johnson v. State, 467 Md. 362, 389, 225 A.3d 44, 60 (2020).

**Merger**

In State v. Stewart, 464 Md. 296, 318, 211 A.3d 371, 384 (2019), this Court explained the required evidence test as follows:

> Under the required evidence test—also known as the same evidence test, Blockburger test, or elements test—Crime A is a lesser-included offense of Crime B where all of the elements of Crime A are included in Crime B, so that only Crime B contains a distinct element. In other words, neither Crime A nor Crime B is a lesser-included offense of the other where each crime contains an element that the other does not.

(Cleaned up).

In <u>Johnson</u>, 467 Md. at 390, 225 A.3d at 60-61, this Court explained the rule of

lenity as follows:

> The rule of lenity is not a rule in the usual sense, but an aid for dealing with ambiguity in a criminal statute. Under the rule of lenity, a court that is confronted with an otherwise unresolvable ambiguity in a criminal statute that allows for two possible interpretations of the statute will opt for the construction that favors the defendant. For a court that is construing a statute, the rule of lenity is not a means for determining—or defeating—legislative intent. Rather, it is a tie-goes-to-the-runner device that the court may turn to when it despairs of fathoming how the General Assembly intended that the statute be applied in the particular circumstances. It is a tool of last resort, to be rarely deployed and applied only when all other tools of statutory construction fail to resolve an ambiguity. This follows from the fact that our goal in construing statutes is always to ascertain and carry out the legislative purpose of the statute and not to seek out an interpretation that necessarily favors one party or the other.

(Cleaned up).

In <u>Carroll v. State</u>, 428 Md. 679, 694-95, 697, 53 A.3d 1159, 1168, 1169 (2012),

this Court explained the principle of fundamental fairness as follows:

> Fundamental fairness is one of the most basic considerations in all [of] our decisions in meting out punishment for a crime. In deciding whether fundamental fairness requires merger, we have looked to whether the two crimes are part and parcel of one another, such that one crime is an integral component of the other. This inquiry is fact-driven because it depends on considering the circumstances surrounding a defendant's convictions, not solely the mere elements of the crimes.
>
> Rare are the circumstances in which fundamental fairness requires merger of separate convictions or sentences. . . . One of the principal reasons for rejecting a claim that fundamental fairness requires merger in a given case is that the crimes punish separate wrongdoing.

(Cleaned up).

### Legislative History of CR §§ 9-305 and 9-306

Before 2002, one statute, Md. Code Ann., Art. 27 (1957, 1996 Repl. Vol., 2001

Supp.) ("Art. 27 (2001)"), § 26 governed both witness tampering and obstruction of justice, stating:

> If any person by corrupt means or by threats or force endeavors to influence, intimidate, or impede any juror, witness, or court officer of any court of this State in the discharge of his [or her] duty, or by corrupt means or by threats or force obstructs, impedes, or endeavors to obstruct or impede the due administration of justice therein, he [or she] is liable to be prosecuted, and on conviction to be punished by a fine not exceeding $10,000, or by imprisonment not exceeding 5 years, or both, according to the nature and aggravation of the offense.

1993 Md. Laws 1566 (Vol. III, Ch. 223, S.B. 261); see also Pagano, 341 Md. at 131, 669 A.2d at 1339-40.

In 2002, as part of the Code recodification process, the General Assembly created the Criminal Law Article. See 2002 Md. Laws 197 (Vol. I, Ch. 26, H.B. 11). At that time, the General Assembly recodified Art. 27 (2001), § 26 as Md. Code Ann., Crim. Law (2002) ("CR (2002)") §§ 9-305 (Intimidating or Corrupting Juror) and 9-306 (Obstruction of Justice). See id. at 666-67. CR (2002) § 9-305 stated:

> (a) Prohibited.
>
> A person may not, by threat, force, or corrupt means, try to influence, intimidate, or impede a juror, a witness, or an officer of a court of the State in the performance of the person's official duties.
>
> (b) Penalty.
>
> A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding $10,000 or both.

Id. at 666 (some capitalization omitted). The Revisor's Note for CR (2002) § 9-305 stated, in pertinent part:

This section is new language derived without substantive change from former Art. 27, § 26, as it referred to intimidating or corrupting a juror.

. . .

Also in subsection (b) of this section, the reference to a person who violates this section being "guilty of a misdemeanor" is added to state expressly that which was only implied in the former law. In this State, any crime that was not a felony at common law and has not been declared a felony by statute is considered a misdemeanor. *See State v. Canova*, 278 Md. 483, 490 (1976); *Bowser v. State*, 136 Md. 342, 345 (1920); *Dutton v. State*, 123 Md. 373, 378 (1914); and *Williams v. State*, 4 Md. App. 342, 347 (1968).

For provisions on bribing a juror, see [CR (2002)] § 9-202[].

2002 Md. Laws 667. CR (2002) § 9-306 stated:

(a) Prohibited.

A person may not, by threat, force, or corrupt means, obstruct, impede, or try to obstruct or impede the administration of justice in a court of the State.

(b) Penalty.

A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding $10,000 or both.

Id. The General Assembly has never amended this language—*i.e.*, CR (2002) § 9-306 is identical to the current version, CR § 9-306. The Revisor's Note for CR (2002) § 9-306 stated in pertinent part: "This section is new language derived without substantive change from former Art. 27, § 26, as it related to obstructing justice. In subsection (a) of this section, the former reference to 'due' administration is deleted as surplusage." Id. (paragraph break omitted).

In 2005, the General Assembly amended CR (2002) § 9-305, in pertinent part, to add the following language:

- 44 -

[(c)](2) If an act described in subsection (a) of this section is taken in connection with a proceeding involving a felonious violation of Title 5 of this article or the commission of a crime of violence as defined in § 14-101 of this article, or a conspiracy or solicitation to commit such a crime, a person who violates this section is guilty of a felony and on conviction is subject to imprisonment not exceeding 20 years.

(d) A sentence imposed under this section may be separate from and consecutive to or concurrent with a sentence for any crime based on the act establishing the violation of this section.

2005 Md. Laws 2571 (Vol. IV, Ch. 461, S.B. 122) (some capitalization omitted).[11]

## Analysis

Here, we conclude that the circuit court did not err in not merging, for sentencing purposes, Wilson's conviction for witness tampering with his conviction for obstruction of justice. The plain language of CR § 9-305(d) provides that a sentence for witness tampering "may be separate from and consecutive to or concurrent with a sentence for any crime based on the act establishing the violation of this section[,] " *i.e*., CR § 9-305(a), the subsection prohibiting witness tampering. The State refers to this subsection as an anti-merger provision that permits separate punishment for the two offenses. And, that is correct. CR § 9-305(d)'s plain language unequivocally demonstrates that the General Assembly intended to allow separate sentences, either consecutively or concurrently, for

---

[11]At the same time, the General Assembly amended CR (2002) § 9-305 such that Md. Code Ann., Crim. Law (2002, 2005 Supp.) ("CR (2005)") § 9-305(c)(1) provided: "Except as provided in paragraph (2) of this subsection, a person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding $5,000 or both." 2005 Md. Laws 2571 (some capitalization omitted).

In 2018, after the State initiated this case, the General Assembly amended CR (2005) § 9-305(c)(1), increasing the maximum sentence of imprisonment from five years to ten. See 2018 Md. Laws 831 (Vol. I., Ch. 145, S.B. 1137).

witness tampering and obstruction of justice. The language of CR § 9-305(d) does not contain an exception for obstruction of justice or for crimes that are allegedly the result of one act—or for any crime, for that matter. Irrespective of whether the offenses merge under the required evidence test, the language of CR § 9-305(d) is clear—a sentence for witness tampering is not required to merge with a sentence imposed for any other offense. In light of the plain language of CR § 9-305(d), we agree with the State that it is not necessary to determine whether the required evidence test mandates merger of Wilson's convictions for witness tampering and obstruction of justice.[12]

We perceive no merit in Wilson's contention that CR § 9-305(d) does not apply because it was not a crime for him to marry Bannister or because he did not commit a crime, such as assault, in addition to witness tampering. Along with there being no exceptions in the language of the subsection, this assertion is in essence a repetition of Wilson's contention that the evidence was insufficient to support his convictions. The inquiry regarding merger does not turn on the sufficiency of the evidence, and there was more than sufficient evidence to support Wilson's convictions.

To the extent that Wilson argues that merger is appropriate because both convictions

---

[12]Because CR § 9-305(d)'s plain language is unambiguous, the rule of lenity also does not apply. See Johnson, 467 Md. at 390, 225 A.3d at 60-61. The rule of lenity assists in breaking a tie when there is unresolvable ambiguity in a criminal statute. See id. at 390, 225 A.3d at 61. Despite the implications of its name, the rule of lenity is not a mechanism that permits a court to dispense leniency because a party seeks it. The rule of lenity applies when the meaning of a criminal statute cannot be ascertained after all of the tools of statutory construction have been exhausted. See id. at 390, 225 A.3d at 61. In this case, we are far from that point. Both the plain language and legislative history of the statute clearly reflect the General Assembly's intent that merger is not required.

were the result of the same act, to determine whether the General Assembly intended separate sentences for the same act, the Court employs a three-step analysis:

> To evaluate the legality of the imposition of separate sentences for the same act, we look first to whether the charges arose out of the same act or transaction, then to whether the crimes charged are the same offense, and then, if the offenses are separate, to whether the [General Assembly] intended multiple punishment for conduct arising out of a single act or transaction violates two or more statutes[.]

Alexis v. State, 437 Md. 457, 485-86, 87 A.3d 1243, 1259 (2014).

Regardless of whether the convictions arose out of the same act, here, it is clear that the crimes charged do not constitute the same offense. The elements of witness tampering at issue here are using "corrupt means [to] try to . . . impede . . . a witness . . . in the performance of the [witness]'s official duties[.]" CR § 9-305(a). The elements of obstruction of justice are using "corrupt means [to] try to obstruct . . . the administration of justice in a court of the State[.]" CR § 9-306(a). Aside from being prohibited by separate statutes, witness tampering includes an element that obstruction of justice does not: influencing, intimidating, or impeding a witness.[13]   See CR § 9-305(a). The legislative history of the offenses shows that the General Assembly split what had been one statute, Article 27, § 26, into two statutes, CR § 9-305 and CR § 9-306, and subsequently increased

---

[13]Even if the General Assembly had not amended the witness tampering statute to add CR § 9-305(d), and the convictions were potentially to merge for sentencing (and it is not clear that they would), under no circumstances would the convictions merge as Wilson contends—with witness tampering merging into obstruction of justice. If the convictions were to merge at all, obstruction of justice would merge into the offense of witness tampering because witness tampering is the offense with the obviously distinct element of trying to "influence, intimidate, or impede a juror, a witness . . . ." CR § 9-305(a). Thus, the twenty-year maximum sentence for witness tampering would remain available.

the maximum penalty for witness tampering to ten or twenty years of imprisonment, depending on the circumstances, while the penalty for obstruction of justice is a maximum sentence of five years of imprisonment.  The statutes also act as safeguards against separate and distinct harms.  The witness tampering statute furthers the goal of protecting the safety and well-being of witnesses and ensures their ability to appear at trial and give testimony, whereas the obstruction of justice statute, as the term implies, seeks to protect the overall administration of justice.  In an ultimate indication of legislative intent, in 2005, the General Assembly amended the witness tampering statute to add CR § 9-305(d)—the anti-merger provision.  There can be no greater demonstration that the General Assembly intended to permit separate sentences for the two offenses than the enactment of this subsection.

Wilson also contends that the holding in Romans 178 Md. at 594, 16 A.2d at 645, stands for the proposition that obstruction of justice and witness tampering are one offense—the offense of obstruction of justice.  In Romans, id. at 594, 16 A.2d at 645, in rejecting a contention that the indictment was duplicitous, we stated: "Every one of the several counts is a statement of the offence followed by the particulars of the offence in plain and unambiguous language so as to give, without repugnancy, the [co-defendant] reasonable information of the nature of a single charge.  More than this is not here necessary."  We added: "The circumstance that the offence stated may come within either the particular and general terms of the denunciation of a criminal statute does not split the offence into separate offences."  Id. at 594, 16 A.2d at 645.  Contrary to Wilson's position, this Court's holding in Romans, id. at 594, 16 A.2d at 645, does not signify that witness

tampering constitutes a means of obstructing justice and that the offenses are one. In Romans, id. at 594, 16 A.2d at 645, this Court simply concluded that the indictment was not duplicitous—not because witness tampering is a means of obstructing justice, but instead because it was permissible for each count of the indictment to quote the entire statute, which prohibited both witness tampering and obstruction of justice at the time.

Finally, merger of the offenses in this case under the principle of fundamental fairness would negate both the plain language of CR § 9-305(d) and the legislative intent revealed by the history of the statute. Moreover, the principle of fundamental fairness is of no avail to Wilson because the principle turns on a consideration of the circumstances of the case. See Carroll, 428 Md. at 695, 53 A.3d at 1168. It cannot be said that it is fundamentally unfair for the circuit court to have imposed concurrent sentences for witness tampering and obstruction of justice, where the evidence demonstrated that Wilson engaged in multiple communications with multiple people over a course of months to orchestrate his marriage to Bannister with the intent of trying to preclude her from testifying as a witness for the State in an attempt to thwart conviction at his upcoming murder trial. Under any of the theories advanced, Wilson's convictions do not merge for sentencing purposes.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTION TO AFFIRM THE JUDGMENTS OF THE CIRCUIT COURT FOR CHARLES COUNTY. RESPONDENT/CROSS-PETITIONER TO PAY COSTS.**